SCHEFFRES *v.* COLUMBIA REALTY CO., INC.

[No. 447, September Term, 1965.]

*Decided November 9, 1966.*

The cause was argued before HAMMOND, C. J., and HORNEY, OPPENHEIMER, BARNES and McWILLIAMS, JJ.

*Jerome E. Korpeck,* with whom were *Wheeler, Moore & Korpeck* on the brief, for appellant.

*Thomas R. Brooks,* with whom were *Waldo Burnside* and *Machen, Brooks & Stanbury* on the brief, for appellee.

BARNES, J., delivered the opinion of the Court.

The appeal in this case is from a final decree entered on August 25, 1965 by the Circuit Court for Prince George's County (Powers, J.) dismissing, with prejudice, the bill of complaint filed on June 9, 1965, by Jerome Scheffres, the appellant and contract purchaser of approximately 24 acres of land known as Columbia Park fronting on Hill Road and adjoining Highland Gardens and also the Highland Park School in Prince George's County. The written contract was dated April 18, 1962, and was with the owner of the property, Columbia Realty Co., Inc. (Columbia or the seller), the seller and appellee in this Court.

The written contract of sale is upon one of the printed forms in current use in Prince George's County. The front of the written contract contains the printed material with appropriate spaces to be inserted; the description of the property, the conditions applicable to the sale and other provisions are typed in on the back of the printed form. The purchaser and the seller signed the contract both on the front and on the back of the printed form.

The contract of sale recited the receipt of a down-payment of $5000 by the check of the purchaser for that amount, to be applied as a part payment on "approximately twenty-four (24) acres [of land] known as Columbia Park fronting on Hill Road and adjoining Highland Gardens and also Highland Park School." There is a reference to a deed recorded among the Land Records of Prince George's County in Liber 766 folio 391 excepting five acres conveyed in Liber 1435 folio 128. The contract also provided that the computation of the area in order to determine the total price is to be made at the purchaser's expense by a registered engineer in the State of Maryland. The purchase price was stated to be $3500 per acre and the purchaser agreed to pay 29 per cent of the total price and no more during the first twelve months. The 29 per cent was to be paid in cash at the date of conveyance, and the $5000 deposit was to be a part of this payment.[1] The purchaser was to "give a first

---

1. The settlement sheet of the District Title Insurance Company, dated March 6, 1964, shows the total purchase under the contract of sale to be $85,120, the original deposit of $5000 an additional deposit of $20,403.60 as the required down payment, and the amount

deed of trust secured upon the premises of the balance then due," the balance to be due in five years and to bear interest at 6 per cent per annum, payable in equal annual installments with interest payable semi-annually. There were also the usual form provisions in regard to freedom from encumbrances, adjustments and examination of title. Settlement was to be made at the office of the District Title Company. The contract of sale provided for a real estate broker's commission of 10 per cent of the sales price to be divided among three brokers in proportions of 40, 30 and 30 per cent. The entire deposit was to be held by the District Title Company until the time of settlement.

On the back of the printed form, in addition to the description of the property sold, appeared the following:

*"Contingencies*

This contract is contingeunt upon 1st., having the property rezoned to R-35 permitting the construction of semi-detached houses and 2nd., obtaining the approval of the Board of Education to trade certain acreage now owned by it for a like amount as shown on the plat prepared by Greenhorn and O'Mara dated March 1962 and which plat is made a part of this contract.

*"Settlement*

Settlement is to be made within sixty days after the above two contingencies have been met.

*"Releases*

Release of ground and/or lots is to be based on payments of $4,500.00 per acre at time of settlement or subsequent payments on the note secured by the Deed of Trust.

*"Dedication*

The sellers and/or Trustees agree to dedicate any and all streets rights of way etc., which may be necessary for the recording of a subdivision plat.

---

of the first deed of trust to the seller to be $60,435.20. There were also various adjustments of taxes and other expenses shown on this settlement sheet.

Purchaser agrees to make application for the change in zoning and the approval of the land trade with the Board of Education within thirty days of the acceptance of this contract by the Seller."

It is important to observe that the contract of sale does not provide that time is of the essence of the contract and does not provide any specific date for settlement (which was to be 60 days after the two contingencies were met) or for the conclusion of the two contingencies already set forth in full.

The plat referred to under "Contingencies" and attached as a part of the contract of sale shows the proposed trade of 3.8813 acres between the owners of the property sold and the Board of Education of Prince George's County (the Board). This plat shows that the Board owns a long rectangular parcel of land 1089 feet long with a width of 209.31 feet which lies almost directly northeast from the existing school building on the southwest side of the rectangular parcel. This long rectangular parcel obviously makes it quite difficult for the owner of the surrounding property (the 24 acre tract) to have a desirable lay-out for development. The trade was to give the Board for the identical acreage contained in the long rectangular parcel, a slightly rectangular tract which projected into the 24 acre tract roughly approximately 550 feet with a median depth of approximately 350 feet. The trade would give both the seller and purchaser a more useful tract and at the same time would give the Board a much more reasonably shaped parcel for the Board's uses.

Both the purchaser and the seller submitted a zoning application for the rezoning to R-35 (residential, semi-detached dwellings) within the 30 day period after the contract of sale was executed. Application for approval of the trade with the Board was submitted on behalf of the purchaser on May 18, 1962, and thereafter a number of discussions with the Board were had in regard to the proposed trade of land.

The first proposal for the even exchange of 3.8813 acres was not acceptable to the Board at its June 1962 meeting. In addition to the 3.8813 acres to be conveyed to the Board under the original proposal, the Board wanted (1) a lot (Lot No. 1) 70

feet wide and fronting on 69th Avenue with a depth of 120 feet, adjoining the property owned by the Board to the southwest and immediately northeast of the existing school building; (2) an entrance way, 50 feet wide and approximately 115 feet deep running from the northeast boundary of the 3.8813 acre parcel to be conveyed to the Board under the original proposal to a proposed street projected on the plat of March 1962, entitled "Study Plan, Blocks A, B, C, D & E, Columbia Park." The lot immediately adjoining the existing school building was desired by the Board to protect that building, and the right-of-way was desired in order to give access to the children using the school to the streets lying to the northeast of the 3.8813 acre parcel to be conveyed to the Board; and (3) that the seller would bear the cost of all street improvements relating to the lot and the right-of-way. At the direction of Otway B. Zantzinger, president of the seller, and of John Devereaux, its real estate agent who had discussed the matter with the Board, counsel for the purchaser prepared a written agreement containing this second proposal for the signatures of the Board and of the seller in August, 1962. This agreement included a provision by which the purchaser also agreed to the arrangement and assumed the payment of the street assessments after the residue of the tract was conveyed to him. Mr. Zantzinger signed this proposed agreement on behalf of Columbia, the seller, as its president. The proposed agreement, however, was never completed because the Board wished other changes in the proposal of August, 1962.

The new proposal, embodied in another proposed written agreement, also prepared by counsel for the purchaser, at the direction of the real estate agent for the seller, Mr. Devereaux, and dated March 18, 1963, expanded the frontage of Lot No. 1 from 70 feet to 74 feet and in lieu of the 50 foot right-of-way, provided for the conveyance to the Board of a second lot with a 60 foot frontage on 69th Avenue (with the same depth of 120 feet) immediately adjoining Lot No. 1 on the northeast. The cost of street improvements for Lots Nos. 1 and 2 was to be borne by the seller. There was an identical provision for the agreement of the purchaser and for the payment of the street assessments by him, as was contained in the proposed agree-

ment of August, 1962. This second proposed agreement was also signed by Mr. Zantzinger on behalf of the seller, but again the Board wished an additional change.

The additional change was that in addition to Lots Nos. 1 and 2, the Board should be conveyed an entrance eight feet wide and approximately 115 feet deep to give access *by foot,* to the children using the school, from the northeast boundary of the 3.8813 acre tract to be conveyed to the Board to the proposed streets appearing on the "Study Plan" plat already mentioned. The cost of the street improvements for Lots Nos. 1 and 2 and the eight foot right-of-way were to be borne by the seller. This proposal was embodied in a proposed written agreement dated 1963, with the day and month blank in the body of the proposed agreement, but it bears the date of April 20, 1963, after the signature of the purchaser. This third proposed written agreement was also prepared by counsel for the purchaser at the direction of the seller's real estate agent, contained the same form for the agreement of the purchaser and for the payment of the street assessments as the forms in the proposed agreements of August, 1962 and of March 18, 1963. Mr. Devereaux, the seller's real estate agent, testified that the Board had indicated that this was the final agreement.

Mr. Zantzinger, declined to sign this last proposed agreement on behalf of Columbia, the seller. As indicated, the agreement had been signed by Mr. Scheffres, the purchaser, at the end of the form for agreement and payment of the street assessments. Mr. Zantzinger stated in his testimony that he did not sign it because he "wanted Mr. Devereaux to get Mr. Scheffres to sign it first."

Subsequent to the signing of the proposed agreement of March 18, 1963, by Columbia, the seller, counsel for the seller, by a letter dated April 8, 1963 to counsel for the purchaser, after reciting the execution of the contract of sale, some of its basic terms and the deposit of $5000, notified the purchaser as follows:

> "Since the original contract several amendments have been suggested. On March 18, 1963, Mr. Zantzinger signed for his Company an agreement which

has to become effective when approved by the Board of Education and Mr. Scheffres. Mr. John Devereaux, who had given Mr. Zantzinger the agreement, later stated that the agreement had not been so approved, therefore it is not in effect. More recently, another form of agreement was presented to Mr. Zantzinger calling for transfer of additional property to the Board of Education.

"Mr. Zantzinger, for the Columbia Realty Company, is willing to treat with the Board of Education in regard to transfer of acreage, but does feel that the many suggested changes, with varying amounts of property involved, have obscured the situation so that it is difficult to understand just what is the present intention of the other parties involved.

"I am writing this letter to state that Mr. Zantzinger is willing to go ahead with the original contract of April 18, 1962, but feels that unless settlement of that contract can be made within 15 days, that the contract should be declared no longer effective, and I was directed to write this letter to that effect."

Mr. Zantzinger testified that he had been advised that the purchaser had threatened to kick Mr. Devereaux out of his office and had declined to sign the last proposed agreement as a result of which Mr. Zantzinger thought the purchaser was not going to go through with the deal. He talked with his counsel about it and suggested the writing of a letter. Mr. Devereaux not only did not testify to any such episode in Mr. Scheffres' office but testified to the following:

"Q. Now, didn't there come a time when you were in Mr. Zantzinger's office and told him Mr. Scheffres wanted to cancel the contract? A. Absolutely not.

"Q. Do you recall the time you went to Mr. Zantzinger's office and made a statement which could be so interpreted? A. I never. That never entered my mind, because they were after me to get the settlement over with, get the agreement with the School Board, get the rezoning. There was never any question of can-

celling the contract. I am sorry if Mr. Zantzinger mis-interpreted anything I said, but that is the truth."

The joint application of the seller and the purchaser for the R-35 rezoning was granted on January 9, 1964, by the County Commissioners of Prince George's County and counsel for the seller was notified of the fact by counsel for the purchaser by a letter dated January 10, 1964. The letter of January 10 also provided:

> "As you are also aware, the Board of Education has also been agreeable to making a transfer of the portion of the property owned by them for a portion owned by your client in conformity with the sales contract, but your client's unwillingness to execute the deed has held up the actual transfer. Nevertheless, the President of the Board of Education has assured us that the transfer will be made with the new property owner at any time.
>
> "Therefore, our client, Jerome Scheffres, is prepared to settle for the property under the terms and conditions of the sales contract between the parties dated April 24, 1962. I would like to arrange a mutually agreeable time for settlement with you at the District Title Company which is the place specified under the terms of the sales contract. Our client would like to make this settlement prior to the end of this month and I would appreciate your calling me to let me know a mutually agreeable settlement date. If I fail to hear from you by January 20, 1964, our client will set a time which is agreeable with him and I will notify you in advance of the date and time of settlement at District Title Company."

Counsel for the purchaser again wrote counsel for the seller on February 26, 1964 and stated, *inter alia,* the following:

> "In addition, as both you and your attorney know, we have been endeavoring for a considerable length of time to conclude the trade with the Prince George's County Board of Education but your refusal to exe-

cute the Deed or to execute a written agreement of trade have prevented the ultimate disposition of this matter in strict accordance with the terms of the contract. However, we have undertaken ourselves, in the absence of your refusal to cooperate to secure the approval from W. Carroll Beatty, President of the Prince George's County Board of Education for this trade and Mr. Beatty has recently verbally assured this office that the trade will be made after the property is transferred to our client. On Mr. Beatty's verbal assurance the purchaser is prepared to proceed with settlement even though you have failed and refused to cooperate with the purchaser and the Prince George's County Board of Education in securing this trade in accordance with the contract.

"Therefore please be advised that the purchaser has arranged for settlement in accordance with the terms of the contract at District Title Insurance Company, 1413 Eye Street, N.W., Washington, D.C., on Friday, March 6, 1964 at 2:00 o'clock, P.M. It is expected that you will be present at that time to execute the deed and receive the purchase price and to execute all settlement papers between the parties."

Counsel for the seller in a letter of March 3, 1964, replying to the letter of February 26, advised counsel for the purchaser that Mr. Zantzinger's attitude had not changed since his letter of April 8, 1963, declaring the contract of sale to be no longer in effect and that the seller would have no representative present at the proposed settlement. The letter of March 3 continued as follows:

"In the last paragraph on the first page of your letter of February 26, 1964, you referred to the refusal of the Columbia Realty Company to execute the transaction for the transfer of land to the Prince George's County Board of Education. Mr. Zantzinger did decline to sign an agreement prepared by your office and signed by Mr. Scheffres on April 20, 1963 for the reason that the terms of the agreement were not in ac-

cordance with his said letter of April 8, 1963. However, Mr. Zantzinger has on several occasions indicated his willingness to recognize this agreement with the Board of Education whether the land in question became the property of your client or remained in the ownership of his company.

"In 1962, Mr. Zantzinger and Mr. Devereaux attended a meeting of the Board of Education, at which time Mr. Zantzinger told the Board that he would go through with the exchange of lands. On two or three occasions I personally talked to Mr. Beatty and/or Mr. Nussbaum, President and Attorney, respectively, of the Board of Education, and told them that if the necessary papers were prepared, Mr. Zantzinger would execute them. However, to date no such papers have been received. Some time ago, Mr. Zantzinger was on the site, and at the time the contractor was making preparations for the commencement of the construction of the school building, and was using the land that would be transferred to the Board for the construction purposes, to which Mr. Zantzinger had no objection. Subsequently, the building is now on its way to final completion, upon land involved in the exchange. * * *."

Mr. Scheffres, the purchaser, testified that he was at all times ready, willing and able to comply with the provisions of the contract of sale. At the time fixed for settlement he appeared, deposited the sum of $20,403.00 (in addition to his original deposit of $5000) as shown by the settlement sheet of March 6, 1964 and, at the settlement, "executed the necessary promissory notes and required deeds of trust or deed of trust."

No representative of Columbia, the seller, appeared at the settlement and suit for specific performance of the contract of sale was filed on June 9, 1964.

We agree with the trial court that there was no abandonment and no mutuality of rescission as a result of the seller's letter of April 8, 1963, as the contingencies provided for in the contract of sale had not been completed. It is clear to us also that there was due diligence exercised by the purchaser to accom-

plish the two contingencies mentioned in the contract of sale. We also agree with the Chancellor that no payment on account of the balance due on the deed of trust could, under the terms of the contract of sale, be made except as provided in that contract, i.e., "in equal annual installments" and that the provision that the purchaser would pay 29 per cent of the total purchase price *"and no more during the first twelve months"* at the date of conveyance, prevents the purchaser from effectuating a release of ground or lots based on payments of $4500 per acre at the time of settlement which the purchaser would otherwise have been able to do but for the quoted restriction. We are of the opinion that the quoted restriction, initialed by the parties, was intended to prevent the contract of sale from being other than an installment contract for federal income tax purposes and superseded the provision for release of lots at the time of settlement.

The purchaser contends that the contingency in the contract of sale in regard to the exchange of acreage was solely for the benefit of the purchaser and the purchaser has the right to waive that provision and settle on the original 24 acres. We are of the opinion that this clause is not *solely* for the purchaser's benefit, but is also for the benefit of the seller whose security for its deed of trust would be impaired to some relatively small degree if the contingency were not carried out as provided in the contract of sale. Hence the purchaser alone may not effectively waive the contingency and impair the seller's security even to the limited extent indicated by the record. See *Barnes v. Euster,* 240 Md. 603, 606-07, 214 A. 2d 807 (1965) ; *Metz v. Heflin,* 235 Md. 550, 552, 201 A. 2d 802 (1964) ; *Bluthenthal & Bickart v. May Co.,* 127 Md. 277, 282, 96 Atl. 434, 436-37, 17A Am. Jur. 2d *Contracts,* §§ 361, 392, *Corbin on Contracts,* § 761 (1960). See also 92 C.J.S. *Waiver,* p. 1067.

The purchaser also contends that the 29 per cent deposit releases land at the time of settlement to the extent of the amount of that deposit on the basis of $4500 an acre and this release of land from the deed of trust will be ample to remove Lots Nos. 1 and 2 and the eight foot right-of-way from the lien of the deed of trust. As we have already indicated, however, the intention of the parties was that the 29 per cent of the purchase

price be paid in cash at the time of settlement *and no more,* and that this provision supersedes the general release clause indicating a possible release of ground or lots at the time of settlement. The first release of ground or lots can only be made one year from the date of the note and deed of trust when the first payment is made on the balance due.

We also agree with the Chancellor that the seller cannot be required to accept a deed of trust securing the balance of the purchase money on land other than that provided for in the contract of sale after giving effect to the trade of lands provided for in that instrument, but we are not convinced from the record that this could not have been accomplished at the time of settlement, at which the seller did not appear, or that this cannot be accomplished now, if the decree of August 25, 1965, dismissing the bill of complaint, with prejudice, is rescinded and a new date of settlement fixed. The purchaser testified that he was ready, willing and able to comply with the provisions of the contract of sale and at the time of settlement, made the required deposit and executed the necessary promissory notes and deed of trust. There is nothing in the record to show that full compliance with the contract of sale cannot be accomplished. Settlement under the terms of the contract of sale was specifically tendered the seller by the letter of January 10, 1964, written by counsel for the purchaser. The promised cooperation of the Board indicated in the letter of February 26, 1964, from counsel for the purchaser to the seller suggests that notwithstanding the seller's refusal to sign the third proposed agreement, the terms of the contract of sale could have been and still can be accomplished by an arrangement between the purchaser and the Board.

For example, in view of the whole situation, the Board might well have entered or may now enter a written agreement with the purchaser to carry out the trade of properties provided for in the contract of sale with the agreement of the purchaser to make the conveyances of Lots Nos. 1 and 2 and the eight foot right-of-way as set forth in the proposed third written agreement at the expiration of one year from date of the deed of trust, and that the purchaser would pay the cost of the street improvements for Lots Nos. 1, 2 and the eight foot right-of-

way and would indemnify the Board from any such costs during the one year period. The purchaser would agree to obtain the necessary release of Lots Nos. 1, 2 and the eight foot right-of-way from the lien of the deed of trust at the end of the one year period in accordance with the contract of sale and could secure the performance of the agreement by a suitable deposit of money or other security in escrow during the one year period. The agreement could be in proper form for recordation and when recorded and the security posted, would appear to afford the Board complete protection. There, of course, may be other means by which the Board and the purchaser have worked out or could work out the matter between themselves whereby the Board would be fully protected and at the same time the contract of sale could be consummated in accordance with its terms.

We are of the opinion that the contract of sale as we have construed it is sufficiently definite to be specifically enforced. As Chief Judge Brune, for the Court, aptly stated in *Born v. Hammond,* 218 Md. 184, 188-89, 146 A. 2d 44, 47 (1958):

> "In *Gibbs v. Meredith,* 187 Md. 566, 51 A. 2d 77, it was held that if a contract is susceptible of two constructions, one of which would produce an absurd result and the other of which would carry out the purpose of the agreement, the latter construction should be adopted. Furthermore, as was said in *Rocklin v. Eanet,* 200 Md. 351, 357, 89 A. 2d 572: '* * * a contract is not rendered unenforceable merely because the parties do not supply every conceivable detail or anticipate every contingency that may arise.' To like effect see also *Quillen v. Kelley,* 216 Md. 396, 407, 140 A. 2d 517, where it was said: '* * * courts are reluctant to reject an agreement, regularly and fairly made, as unintelligible or insensible. The agreement will be sustained if the meaning of the parties can be ascertained, either from the express terms of the instrument or by fair implication. The law does not favor, but leans against the destruction of contracts because of uncertainty; therefore, the courts

will, if possible, so construe the contract as to carry into effect the reasonable intention of the parties if that can be ascertained. *Middendorf, W. & Co. v. Milburn Co.*, 134 Md. 385, 387, 388 * * *.' "

In our opinion, in view of the absence of any provision that time was of the essence in the contract of sale; the attempt of the seller to rescind the contract of sale prior to the obtention of the new zoning in clear contravention of the terms of the contract of sale; the request of the seller to have two of the proposed agreements with the Board prepared, which were signed by the seller; and the failure of the seller to appear at the date originally fixed for settlement, a reasonable time for settlement pursuant to the contract of sale has not yet passed. See *Chapman v. Thomas*, 211 Md. 102, 126 A. 2d 579 (1956). We think that a new date of settlement should be set at which the purchaser will have the opportunity to settle in accordance with the contract of sale. To accomplish this we will neither affirm nor reverse the order of August 25, 1965, but will remand the case to the trial court with instructions to that court to rescind the order of August 25, 1965, so that a new time of settlement may be fixed 60 days from the date the mandate in this case is received in the lower court and that the case be set for an additional hearing 90 days from the date the mandate is received in the lower court for the final disposition of the suit, depending upon whether the purchaser is able to comply with the terms of the contract of sale at the time of the new settlement.

> *Order of August 26, 1965, neither affirmed nor reversed, and the case remanded to the lower court for further proceedings in accordance with the opinion of this Court, one-half of the costs to be paid by the appellant and the remaining one-half of the costs to be paid by the appellee.*