# CHARLES COUNTY BROADCASTING CO., INC.
## *v.* MEARES ET AL.

[No. 68, September Term, 1973.]

*Decided November 12, 1973.*

*Motion for rehearing filed December 10, 1973; denied December 11, 1973.*

The cause was argued before MURPHY, C. J., and BARNES, SINGLEY, SMITH, DIGGES and LEVINE, JJ.

*Henry F. Leonnig,* with whom was *Eugene E. Pitrof* on the brief, for appellant.

*T. Myron Loyd* for appellees.

SINGLEY, J., delivered the opinion of the Court.

In June, 1968, Meares and two associates, a partnership doing business as B & M Broadcasting Company (Meares), contracted to purchase the broadcasting facilities of Radio Station WSMD-FM, located at La Plata, Maryland, from Charles County Broadcasting Company, Inc. (Broadcasting) for $100,000.00, of which $40,000.00 was to be paid in 90 days. The contract was expressly subject to the consent of the Federal Communications Commission (the Commission) to the transfer of the station's license from Broadcasting to Meares.[1] When the contract had not been performed by June, 1970, Meares brought an action against Broadcasting in the Circuit Court for Charles County, seeking specific performance and damages for breach of contract. The specific performance sought by Meares was actually an order that Broadcasting execute an additional agreement which had become a necessary condition to approval of the transaction by the Commission. Broadcasting answered, denying that it was obligated under the contract to do so. From a decree entered in January, 1973, awarding damages in the amount of $147,500.00, with interest and costs, in Meares' favor against Broadcasting, Broadcasting has appealed.

Broadcasting assigns six reasons why the decree of the lower court should be vacated, which we shall restate and consider in order, supplying such additional facts as may be pertinent to our consideration:

    (i) The lower court could not retain jurisdiction

---

1. The contract was also subject to the condition that the Commission consent to a change in location of the station from La Plata to Oxon Hill, and provided that it could be terminated by either party on written notice to the other if approval of both conditions were not received within 24 months after filing with the Commission.

once Meares voluntarily withdrew his claim for equitable relief.

(ii) The failure of Broadcasting to execute an "accommodation agreement" did not constitute a breach of the contract of sale with Meares.

(iii) When Meares sought specific performance, with full knowledge of the facts, he waived any breach by Broadcasting.

(iv) Meares' failure substantially to perform his part of the bargain under the contract of sale prevented his assertion of a breach by Broadcasting.

(v) The evidence was insufficient to support the damages awarded below.

(vi) Loss of bargain damages may not be awarded when there are no facts alleged in the bill of complaint to give notice of or support for such a claim.

It will be helpful, before considering each of Broadcasting's contentions, to set out a brief overview of the manner in which this Court has dealt with specific performance cases.

The granting of specific performance rests within the sound discretion of the trial court, *Horst v. Kraft*, 247 Md. 455, 459, 231 A. 2d 674, 676 (1967); Restatement of Contracts § 359 (1) (1932). If a contract is fair, reasonable and certain, specific performance may be granted almost as a matter of course, *Excel Co. v. Freeman*, 252 Md. 242, 246, 250 A. 2d 103, 106 (1969). This is true even if the contract is contingent, if the contingency can be met, *Scheffres v. Columbia Realty Co.*, 244 Md. 270, 284, 223 A. 2d 619, 626 (1966); within the time stated, *Paape v. Grimes*, 256 Md. 490, 499, 260 A. 2d 644, 649 (1970). *See generally Chapman v. Thomas*, 211 Md. 102, 126 A. 2d 579 (1956).

While specific performance has been historically associated with contracts for sale of land, it has been invoked to enforce other contracts for at least a century, Simpson, *Fifty Years of American Equity*, 50 Harv. L. Rev.

171, 173 (1936). *See Board of County Comm'rs v. MacPhail,* 214 Md. 192, 133 A. 2d 96 (1957) (paving public road); *Wolbert v. Rief,* 194 Md. 642, 650-51, 71 A. 2d 761, 764-65 (1950) (sale of a business).

It has long been established that if the remedy of specific performance is possible when the vendee brings suit, but while the action is pending, a vendor disables himself from performing his contract, damages may be awarded in lieu of specific performance, *Busey v. McCurley,* 61 Md. 436, 448 (1884); *Powell v. Young,* 45 Md. 494, 498 (1877); *Green v. Drummond,* 31 Md. 71, 84 (1869); *Rider v. Gray,* 10 Md. 282, 300 (1856); 1 Pomeroy, Equity Jurisprudence § 237f, at 443 (5th ed. 1941); Miller, Equity Procedure § 672 (1897); Pomeroy, Specific Performance of Contracts § 294, at 372 (2d ed. 1897).[2] *See Kappelman v. Bowie.* 201 Md. 86, 90, 93 A. 2d 266, 268 (1952) ("equity may refuse . . . to . . . enforce a hard bargain").

If a complainant files a bill for specific performance at a time when he knows specific performance is impossible, and the sole remaining prayer for relief is for damages, his bill will be dismissed, *Davis v. Winter,* 168 Md. 613, 618-19, 178 A. 604, 605-06 (1935). Although specific performance cannot be decreed once performance has become impossible, *Powichrowski v. Sicinski,* 139 Md. 376, 383, 114 A. 899, 901-02 (1921), damages may be awarded in the same equitable proceeding, Restatement of Contracts, *supra,* § 363 and illustration 1 at 657, provided that at the time the action was commenced in equity, specific performance was in fact obtainable, *Harris v. Harris,* 213 Md. 592, 597, 132 A. 2d 597, 600 (1957). *Compare Prucha v. Weiss,* 233 Md. 479, 485, 197

---

**2.** It is interesting to note that "Lord Cairns' Act," 21 & 22 Vict. ch. 27, passed in 1858, which conferred upon the court of chancery express authority to award damages in addition to or in substitution for specific performance so settled the issue of jurisdiction that jurisdiction remained after the Act was superseded by the Judicature Act in 1873, 1 Pomeroy, Equity Jurisprudence § 237e, at 441-42 (5th ed. 1941). Our statutory approach is somewhat different. Maryland Code (1957, 1973 Repl. Vol.) Art. 16, § 169, provides that the complainant shall not be denied specific performance on the ground that there is an adequate remedy in damages unless the respondent satisfies the court that he has property of sufficient value or gives bond. *See* Edison Realty Co. v. Bauernschub, 191 Md. 451, 458, 62 A. 2d 354, 357 (1948) (construing predecessor of § 169).

A. 2d 253, 256, *cert. denied,* 377 U. S. 992 (1964), where an equity court was held to be without jurisdiction to grant money damages when no independent grounds of equitable jurisdiction were present.

If the object of the bill is to compel specific performance and there is a prayer for general relief, damages traditionally could be awarded under that prayer, *Powell v. Young, supra,* 45 Md. at 496-97; Miller, *supra,* § 673.

The rule as to measure of damages is articulated in *Hartsock v. Mort,* 76 Md. 281, 288-89, 25 A. 303, 304 (1892), quoting, with minor editing, from *Hammond v. Hannin,* 21 Mich. 374, 387 (1870):

> "If the vendor acts in bad faith, — as, if having title he refuses to convey, or disables himself from conveying, — the proper measure of damages is the value of the land at the time of the breach; the rule, in such case, being the same in relation to real as to personal property. But, on the other hand, if the contract of sale was made in good faith, and the vendor for any reason is unable to perform it, and is guilty of no fraud, the clear weight of authority is that the vendee is limited in his recovery to the consideration money (paid) and interest, with perhaps in addition, the costs of investigating the title."

This is essentially the English rule, adopted by *Flureau v. Thornhill,* 96 Eng. Rep. 635 (1776). *See generally* McCormick, Law of Damages § 179 (1935).

Under *Hartsock v. Mort, supra,* we conceive good faith to be that ordinarily exhibited by a seller who is unable to perform through no fault or fraud of his own, while bad faith is that shown by a seller who refuses to perform when able to do so, *Horner v. Beasley,* 105 Md. 193, 198, 65 A. 820, 822 (1907).

Turning now to the facts of the matter before us, there was a paragraph in the 1968 contract of sale which is of particular significance:

> "This Agreement is subject to the further

condition that the Federal Communications Commission shall consent to a change in the location of Station WSMD-FM from La Plata, Maryland, to Oxon Hill, Maryland. Buyer and Seller agree that they will promptly (within 60 days) and simultaneously file with the Federal Communications Commission applications for consent to the sale contemplated herein, and for a construction permit for the change in location of the station from La Plata, Maryland, to Oxon Hill, Maryland. Buyer and Seller will vigorously prosecute said applications, and do all things reasonably necessary or appropriate to obtain a grant thereof. If both applications are not granted within a period of 24 months following the tendering of said applications for filing, this Agreement may be terminated by either party upon written notice to the other, and upon such termination, all obligations between Buyer and Seller hereunder shall cease and any monies paid hereunder by Buyer to Seller shall be returned to Buyer."

The difficulty that arose was that within a month of the execution of the June, 1968 contract of sale, a Baltimore radio station, WITH-FM, had filed with the Commission an application for a change in the location of its facilities. Because WITH-FM proposed to locate its transmitter in Catonsville, and because Meares proposed to relocate WSMD-FM's transmitter at Piscataway, with a studio at Oxon Hill, it seems to be conceded that there would have been interference between the two stations. In October, 1968, the Commission suggested the execution of an "accommodation agreement" which was signed on behalf of Meares and WITH-FM in August of 1969.[3] It was presented to David P. Samson, Jr., president of Broadcasting, shortly

---

**3.** Since the locations were about 45 miles apart and the stations operated on adjacent frequencies, WSMD-FM on 104.1 megahertz, WITH-FM on 104.3 megahertz, it was the agreement's purpose to minimize any overlapping of signals to a minimum acceptable to both stations.

thereafter. For some reason, Samson did nothing about signing the agreement until June of 1970, nearly two years later, when Broadcasting's counsel sent to counsel for WITH-FM a counterproposal.[4] This was rejected by WITH-FM's counsel by a letter terminating further negotiations. Within a matter of days, Meares brought suit.

### (i)

The lower court could not retain jurisdiction once Meares voluntarily withdrew his claim for equitable relief.

As we understand Broadcasting's argument, it is essentially this: either Meares knew, or should have known, that he could not specifically enforce the contract at the time suit was instituted, or this must have become apparent to him by the time the case was tried. Once Meares abandoned his claim for specific performance,[5] Broadcasting contends, the court lacked the power to award damages.

It seems to us that there are two answers to this argument. First, despite the letter of 10 June 1970 from WITH-FM's counsel, which foreclosed further negotiations along the line suggested by Broadcasting, there is no suggestion that the issue could not have been resolved at any time prior to or immediately after the institution of suit. If Broadcasting had been willing to sign the accommodation agreement which had been prepared by WITH-FM in August of 1969 and had been in Samson's possession shortly thereafter, which had been signed by WITH-FM and Meares, such resolution would have been possible. The threshold purpose of the suit was to require Broadcasting to sign the accommodation agreement, so that Commission approval could be obtained.

Second, once it became apparent to Broadcasting that Meares proposed to seek damages, Broadcasting could have

---

**4.** There was testimony that during this period Meares had proposed the relocation of WSMD-FM at Waldorf, Maryland. This was unacceptable to Samson, who wanted WSMD-FM removed from Charles County for considerations of competition.

**5.** The parties agree that this occurred just before trial.

suggested that the case be transferred to a court of law for trial, *see* Maryland Rule 515 a; *Barnes v. Webster*, 220 Md. 473, 477, 154 A. 2d 918, 921 (1959). Absent such a suggestion, the question cannot be raised for the first time on appeal, Rule 885, *Stuart v. Johnson*, 181 Md. 145, 147, 28 A. 2d 837, 838 (1942). Moreover, as a practical matter, the question of jurisdiction was waived when Broadcasting acquiesced in Meares' choice of a forum, *Haldas v. Commissioners of Charlestown*, 207 Md. 255, 263, 113 A. 2d 886, 890 (1955), because once having assumed jurisdiction, a court of equity retains jurisdiction, *Meyer v. Saul*, 82 Md. 459, 33 A. 539 (1896), until all matters are disposed of, *Brewster v. Brewster*, 207 Md. 193, 199, 114 A. 2d 53, 56 (1955), including the award of damages, *Real Estate Trust Co. v. Bird*, 90 Md. 229, 44 A. 1048 (1899). "The general rule in equity is that once equitable jurisdiction has attached, the equity court will give full and complete relief in order to avoid circuity of action, even though the relief ultimately given is relief ordinarily granted at law by way of a monetary judgment," *Phil J. Corp. v. Markle*, 249 Md. 718, 725, 241 A. 2d 718, 722 (1968).

(ii)

The failure of Broadcasting to execute an "accommodation agreement" did not constitute a breach of the contract of sale with Meares.

This is the least persuasive of Broadcasting's arguments. Of Broadcasting's contractual commitment to join with Meares in his application for permission to relocate WSMD-FM's facilities there can be no doubt. Broadcasting attempts to evade this responsibility by complaining that the interference with WITH-FM was the consequence of WSMD-FM's application for an increase in power and in tower height. The simple answer is, however, that the chancellor found as a fact that Broadcasting had effectively frustrated whatever plans Meares may have had by refusing to sign the accommodation agreement, and had effectively breached the contract by 1 December 1969.

Meares' expert witness, Lauren A. Colby, testified that if

the agreement had been signed, the Commission would have issued the license, certainly within six months. Broadcasting's witness, Arthur Stambler, testified that the license would not have been issued, in his opinion, because of the Commission's "suburban community" rule.[6] The trial court accepted Colby's testimony and rejected Stambler's, as it had a right to do, Rule 886.

### (iii)

When Meares sought specific performance, with full knowledge of the facts, he waived any breach by Broadcasting.

This argument, in essence, is this: by seeking to have the contract specifically enforced, Meares waived Broadcasting's delay. Assuming, for the purposes of argument, that this is true, what Meares was seeking, and what he never waived, was Broadcasting's performance of the contract of sale, conditioned upon its joinder in the accommodation agreement, which, the trial court found, it was bound by contract to sign.

Additionally, as Meares points out, this was a question not raised below and is not before us on appeal, Rule 885.

### (iv)

Meares' failure substantially to perform his part of the bargain under the contract of sale prevented his assertion of a breach by Broadcasting.

The thrust of this argument seems to be that Meares failed aggressively to pursue his application before the Commission. Meares' response is that the application came to a grinding halt when Broadcasting refused to enter into the accommodation agreement; that the chancellor so found, and that this finding is not clearly erroneous, Rule 886. We agree, and will not disturb the finding.

---

6. Stambler testified that this rule was intended to prevent suburban stations becoming oriented to a metropolitan area rather than to their local communities.

(v)

The evidence was insufficient to support the damages awarded below.

Here, Broadcasting challenges the chancellor's award of damages in the amount of $147,500.00: $100,000.00 for the loss of the right to purchase for $100,000.00 a radio station which the chancellor found to be worth $200,000.00; $40,000.00, being the return of Meares' deposit, plus $7,500.00, being interest on the $40,000.00 deposit from date of breach, which the court found to be 1 December 1969, to date of decree, 31 January 1973.

The award of damages was based on the testimony of two witnesses. First, James S. Beattie, called as a witness by Meares, testified without objection that in October, 1970, he had made an offer of $250,000.00 for the purchase of 70% of Broadcasting's stock, which would have included both the AM and FM facilities of WSMD, and thus attributed to a 100% interest a value of about $350,000.00. Second, Meares' expert, Ernest H. Clay, a broadcast management consultant and radio station broker, was permitted to testify over objection that he had accumulated prices at which FM stations in comparative suburban markets had been sold during the preceding two-year period. It was his opinion that WSMD-FM located at Oxon Hill with 10 kilowatts of power and a 450-foot antenna would be worth $350,000.00. He chose as comparables WXTS, Annapolis, Maryland, 20 kilowatts, 250-foot antenna, sold in February, 1971 for $350,000.00; KFAD, Arlington, Texas, 50 kilowatts, 670-foot antenna, sold in October, 1971 for $225,000.00; WHMS, Hialeah, Florida, 3 kilowatts, 110-foot antenna, sold in June, 1972 for $290,000.00, and KREM, Santa Clara, California, 50 kilowatts, 200-foot antenna, sold in February, 1972 for $470,000.00.

We think that testimony as to comparable sales was properly admitted as a basis for Clay's opinion, *Marchant v. Baltimore*, 146 Md. 513, 525, 126 A. 884, 888 (1924); *cf. D'Arago v. State Roads Comm'n*, 228 Md. 490, 498, 180 A. 2d 488, 492 (1962). Broadcasting makes much of the fact that

what Meares proposed to transfer to Oxon Hill was a station having one kilowatt (1000 watts) of power and an antenna 200 feet high. The short answer to this contention is that the chancellor obviously took this disparity into consideration in fixing the amount of damages, and discounted substantially Clay's figure of $350,000.00.

The rule of our cases is "that if compensatory damages are to be recovered, they must be proved with reasonable certainty, and may not be based on speculation or conjecture," *Asibem Associates, Ltd. v. Rill,* 264 Md. 272, 276, 286 A. 2d 160, 162 (1972); *Maicobo Inv. Corp. v. Von Der Heide,* 243 F. Supp. 885, 893 (D. Md. 1965). Additionally, in breach of a contract to sell, damages are based on value at the time the transfer was to be made, and not on contract price, *Asibem Associates, Ltd. v. Rill, supra,* 264 Md. at 280, 286 A. 2d at 164.

Ordinarily, the allowance of interest is left to the discretion of the jury or to the court sitting without a jury, *Atlantic States Constr. Co. v. Drummond & Co.,* 251 Md. 77, 85, 246 A. 2d 251, 255 (1968). This rule was qualified in *Atlantic States* by this passage quoted from *Affiliated Distillers Brands Corp. v. R.W.L. Wine & Liquor Co.,* 213 Md. 509, 516, 132 A. 2d 582, 586 (1957): "However, this general rule is subject to certain exceptions that are as well established as the rule itself. Among the exceptions are cases on bonds, or on contracts, to pay money on a day certain, and cases where the money has been used." There was testimony from which the chancellor could have found, as he apparently did, that the deposit of $40,000.00 had been used by Broadcasting for its corporate purposes.

Finally, Broadcasting makes an oblique attack on the allowance of interest because Meares had never demanded a return of his deposit. To have done so would have been wholly inconsistent with the theory on which Meares initially sought relief, by holding Broadcasting to the performance of an obligation it had assumed under the contract.

Broadcasting proffered no testimony as to value, and the chancellor concluded that the fair market value of

WSMD-FM was $200,000.00. What appears to be Broadcasting's attack on the allowance of lost profits is groundless. It is clear that testimony in this regard was excluded. Under the circumstances of the case, and based on the testimony before the chancellor, we cannot say that he was clearly in error, Rule 886.

(vi)

Loss of bargain damages may not be awarded when there are no facts alleged in the bill of complaint to give notice of or support for such a claim.

Broadcasting argues that Meares' recovery should be limited to a return of his $40,000.00 deposit because there are no factual allegations in the bill of complaint on which a recovery of additional damages could be based.

Meares counters with the contention that paragraphs 13 and 14 of his bill of complaint put Broadcasting on notice of the claim:

"13. That if the Defendant had acted in good faith and signed all applications and the agreement marked Plaintiffs Exhibit No. 2, the application filed with the Federal Communications Commission for a transfer of Station WSMD-FM from La Plata, Maryland to Oxon Hill, Maryland, would have been acted upon prior to the end of the year 1969 and the Plaintiffs would have been operating said station for the entire year of 1970 to the date of the filing of this Bill of Complaint and that as a result of the breach of said agreement irreparable damages have been suffered by the [Plaintiffs] and that the nature of this agreement is such that legal action in a Court of law for damages would not give adequate relief to the Plaintiffs in this action."

"14. That as a result of the delay on the part of the Defendant and a breach of his agreement of June 27, 1968, said agreement being marked Plaintiffs' Exhibit No. 1 and attached hereto, the Plaintiffs

have suffered damages to the extent of TWO HUNDRED THOUSAND ($200,000.00) DOLLARS."

Paragraph 2 of the prayer for relief requested:

"That this Court assess damages against the Defendant for his breach of contract in failing to abide by the agreement as proposed herein."

The chancellor found that the facts adduced by Meares supported this claim, and we cannot say that he was clearly in error, Rule 886.

As we pointed out earlier, loss of bargain damages are available when a vendor acts in bad faith, *Hartsock v. Mort, supra*, and may be recovered in a specific performance suit under a prayer for general relief, *Powell v. Young, supra*, 45 Md. at 496-97; Miller, *supra*, § 673.

*Decree affirmed, costs to be paid by appellant.*