## FRAN REALTY, INC. ET AL. *v.* EDWARD THOMAS, JR. ET AL.

[No. 381, September Term, 1975.]

*Decided February 27, 1976.*

The cause was argued before POWERS, GILBERT and MENCHINE, JJ.

*Eugene P. Smith,* with whom was *Perry Raabe* on the brief, for appellants — cross-appellees.

*Robert M. Wright,* with whom were *Whiteford, Taylor, Preston, Trimble & Johnston* on the brief, for appellees — cross-appellants, Edward Thomas, Jr., and Angela Thomas. *Leonard Z. Bulman* for other appellees — cross-appellants.

MENCHINE, J., delivered the opinion of the Court.

Fran Realty, Inc., Phyllis Realty, Inc. and Harriett Realty, Inc., associated together under the trade name "Ridge Realty Company," hereinafter called "developers," were the owners and developers of a tract of land known as "Southgate," in Anne Arundel County, Maryland.

In early 1972 developers entered into separate contracts for the sale of two separate specific lots within that recorded subdivision. One such contract was with Edward Thomas and Angela Thomas (Thomases); the second was with William Sipple and Geraldine Sipple (Sipples). The

Thomases and the Sipples sometimes collectively will be referred to herein as "home buyers."

In each instance developers agreed for a stated sum to construct a dwelling upon the respective lots for the Thomases and the Sipples.[1] The contracts provided that the dwellings were "to be built in accordance with plans and specifications on file with Anne Arundel County and in the offices of Crown Realty Development, and similar to sample house, the Crown Jamaican — "Type A," located at 7947 Elvaton Road, Glen Burnie." Settlement dates in September, 1972 were set in the contracts, but time was not of the essence and extensions without a fixed time limitation had been agreed upon among the parties. In July, 1973, however, developers declined to go forward with construction and tendered the return of the down payments made by appellees. Developers' basis for declining to go forward was that "* * * the sub-surface conditions of the lot[s] render it impossible to construct any dwelling in accordance with the plans and specifications agreed upon. There is a silty sand base above a hard clay sub-stratum and, between the two levels, a vast pool of water, creating a water table only slightly below the surface of the lot[s] involved. We did not know about such conditions at the time of the * * * contract[s] * * *." Home buyers rejected the tender and filed separate bills for specific performance of their contracts. The actions were consolidated and tried together. The chancellor denied specific performance because he found that it was "* * * likely that a decree of specific performance would require such extended supervision and continuing resolution of disputes as to outweigh the benefits to be gained." The chancellor decided to award monetary damages to the home buyers as alternative relief. A decree was passed entering judgment in favor of the Thomases for $11,350.00 and in favor of the Sipples for $10,600.00.

---

1. The contract price of land and dwelling as to the Thomases was $29,250.00, with the lot included therein evaluated at $5600.00, and called for, by way of extras, "fireplace in basement and #700 Series Windows." The contract price for land and dwelling as to the Sipples was $28,400.00, with the lot included therein evaluated at $5300.00.

Developers and home buyers have appealed. Developers seek reversal and dismissal of the bills of complaint. Home buyers seek reversal as to damages only.

## Developers' Appeal

Developers thus state the questions presented by their appeal:

1. Did the chancellor have any right to decree specific performance or to award monetary damages? (Equity Jurisdiction)
2. Were they relieved of going on with the contracts? (Rescission or Breach)
3. What is the date of breach, if any, for computation of damages? (Date of Breach)

### 1. *Equity Jurisdiction*

Developers argue that there was no equitable jurisdiction because: (a) a building contract will not be specifically enforced; (b) when the court denied specific performance, general equity jurisdiction was otherwise lacking; and (c) the home buyers were not ready, willing, able and eager to perform.

(a) Enforcement of a building contract

The general rule and an exception are thus stated in Pomeroy's *Specific Performance of Contracts*, (3d Ed. 1926) § 23, at 61, *et seq.*:

"The general rule is now well settled that, on account of the great difficulty and often impossibility attending a judicial superintendence and execution of the performance, contracts for the erection or repair of buildings, the construction of works, and the conduct of operations requiring time, special knowledge, skill, and personal oversight, will not be specifically enforced. Notwithstanding this general rule and the cogent reason which supports it, there are certain excep-

tions; and contracts for building or for the construction of works, and the like, falling within them, may be specifically enforced. 1. It has been said that if an agreement for erecting a building is in its nature defined, there is no difficulty in entertaining a suit for its specific performance. But a contract to build a house of a certain value merely, does not come within this description of an agreement sufficiently defined, and will not be enforced. 2. Whether or not the opinion of Ld. Rosslyn is to be regarded as a correct statement of the law, it is settled by the recent English decisions, that where the defendant has contracted to construct some work which is defined on his own land, and where the plaintiff has a material interest in the execution thereof, which is not susceptible of adequate compensation in damages, a specific performance of the undertaking will be compelled."

It is quite plain that Maryland recognizes the general rule and the cited exception. *Ward v. Newbold*, 115 Md. 689, 696, 81 A. 793, 795-96 (1911); *Brummel v. Realty Co.*, 146 Md. 56, 64, 125 A. 905, 908 (1924); *Edison Realty Co. v. Bauernschub*, 191 Md. 451, 457, 62 A. 2d 354, 356-57 (1948), and *Laurel Realty Co. v. Himelfarb*, 191 Md. 462, 467, 62 A. 2d 263, 265 (1948).

The growth and the extent of the rule and the exception were discussed in *Edison Realty Co. v. Bauernschub, supra,* where it was said at 457-58 [356-57]:

"In England there was confusion for many years as to how far courts of equity ought to entertain suits for specific performance of a covenant to build or rebuild a house of a specified form and size on particular land. In *City of London v. Nash*, 3 Atk. 512, 515, Lord Hardwicke recognized the power of the court in this respect, but said that the court should not specifically enforce a covenant to make repairs to a house. The ground of his opinion in that

case, which was between a landlord and tenant, was that on the covenant to repair the tenant might have a remedy at law. In some of the later decisions, however, it was held that no covenant to build or rebuild ought to be enforced specifically in equity. It was considered that there could be adequate compensation in damages in a court of law, and a court of equity ought not to undertake to construct a building any more than to make repairs. *Lucas v. Comerford*, 3 Bro. Ch. 167; *Errington v. Aynesly*, 2 Bro. Ch. 343. But the English courts finally adopted the rule that they would decree specific performance where the defendant has entered into a contract to construct on his own land work which is clearly defined, and the complainant has a material interest in its performance, and failure to perform is not susceptible of adequate compensation in damages. 2 *Story, Equity Jurisprudence*, 14th Ed., secs. 1006-1008.

The Court went on to say at 458 [357]:

"So, we hold in this State that where complainants have purchased land improved by an unfinished house and the vendor has installed an insufficient heating apparatus, or has failed to do certain work which he agreed to do, the court of equity has power to decree specific performance, where the work which has not been performed is clearly defined * * *."

In *Daniel v. Kensington Homes, Inc.*, 232 Md. 1, 192 A. 2d 114 (1963), the Court of Appeals discussed the above cited cases in explicating the rule and the exception, saying at 7 [118]:

"Both *Brummel v. Clifton Realty Co., Inc.*, 146 Md. 56, 125 A. 905, and *Edison Realty Co. v. Bauernschub*, 191 Md. 451, 62 A. 2d 354, * * * hold that specific performance of a construction contract

to complete a house may be decreed, in the discretion of the court, if the work to be done is clearly defined. See also *Laurel Realty Co. v. Himelfarb*, 191 Md. 462, 62 A. 2d 263. The general rule of equity against specific performance of a contract to build or repair is not absolute and without exception. See *Ward v. Newbold*, 115 Md. 689, 696, 81 A. 793, where, however, specific performance was denied because of the indefiniteness of the contract."

In *City Stores Company v. Ammerman*, 266 F. Supp. 766 (U.S.D.C. for D.C. 1967), affd. 394 F. 2d 950 (1968), it was said at 776-77:

"Some jurisdictions in the United States have opposed granting specific performance of contracts for construction of buildings and other contracts requiring extensive supervision of the court, but the better view, and the one which increasingly is being followed in this country, is that such contracts should be specifically enforced unless the difficulties of supervision outweigh the importance of specific performance to the plaintiff. 5 Williston on Contracts § 1423 (Rev.Ed.1937). This is particularly true where the construction is to be done on land controlled by the defendant, because in that circumstance the plaintiff cannot employ another contractor to do the construction for him at defendant's expense. In the case at bar, the fact that more than mere construction of a building is involved reinforces the need for specific enforcement of the defendants' duty to perform their entire contractual obligation to the plaintiff."

In the subject case title to the land upon which the two houses were to be built was held by the developers. Early on, the Court of Appeals adopted the observation of Story that: "Where, indeed, a contract respecting real property is in its nature and circumstances unobjectionable, it is as much a

matter of course for Courts of Equity to decree a specific performance of it, as it is for the Court of Law to give damages for a breach of it." *Smoot v. Rea*, 19 Md. 398 (1863).

Application of these principles to the subject contracts persuades us that appellees' bills for specific performance were appropriate actions by them to seek such discretionary equitable relief. In *Charles Co. Broadcasting Co. v. Meares*, 270 Md. 321, 311 A. 2d 27 (1963), it was said at 324 [30]:

> "The granting of specific performance rests within the sound discretion of the trial court, *Horst v. Kraft*, 247 Md. 455, 459, 231 A. 2d 674, 676 (1967); Restatement of Contracts § 359 (1) (1932). If a contract is fair, reasonable and certain, specific performance may be granted almost as a matter of course, *Excel Co. v. Freeman*, 252 Md. 242, 246, 250 A. 2d 103, 106 (1969). This is true even if the contract is contingent, if the contingency can be met, *Scheffres v. Columbia Realty Co.*, 244 Md. 270, 284, 223 A. 2d 619, 626 (1966); * * *"

In the subject case the land was titled in the developers. The home buyers had a material interest in seeking to obtain the home of their choice at the place of their choice. The nature of the performance to be required of the developers was clearly defined — well within the certainty required by the decided cases. *See: e.g., Laurel v. Himelfarb, supra; Cohen v. Baltimore County*, 229 Md. 519, 185 A. 2d 185 (1962); *Edison Realty Co. v. Bauernschub, supra; Kandalis v. Paul Pet Construction Co.*, 210 Md. 319, 123 A. 2d 345 (1956).

An adequate basis for equitable jurisdiction was shown.

(b) Damages in lieu of specific performance

We regard the case of *Charles Co. Broadcasting Co. v. Meares, supra*, to be dispositive of the question. In *Meares* it was said at 325 [30-31]:

> "*It has long been established that if the remedy of specific performance is possible when the vendee brings suit, but while the action is pending, a vendor disables himself from performing his*

*contract, damages may be awarded in lieu of specific performance, Busey v. McCurley,* 61 Md. 436, 448 (1884); *Powell v. Young,* 45 Md. 494, 498 (1877); *Green v. Drummond,* 31 Md. 71, 84 (1869); *Rider v. Gray,* 10 Md. 282, 300 (1856); 1 Pomeroy, Equity Jurisprudence § 237f, at 443 (5th ed. 1941); Miller, Equity Procedure § 672 (1897); Pomeroy, Specific Performance of Contracts § 294, at 372 (2d ed. 1897). *See Kappelman v. Bowie,* 201 Md. 86, 90, 93 A. 2d 266, 268 (1952) ('equity may refuse . . . to . . . enforce a hard bargain').

"If a complainant files a bill for specific performance at a time when he knows specific performance is impossible, and the sole remaining prayer for relief is for damages, his bill will be dismissed, *Davis v. Winter,* 168 Md. 613, 618-19, 178 A. 604, 605-06 (1935). Although specific performance cannot be decreed once performance has become impossible, *Powichrowski v. Sicinski,* 139 Md. 376, 383, 114 A. 899, 901-02 (1921), damages may be awarded in the same equitable proceeding, Restatement of Contracts, *supra,* § 363 and illustration 1 at 657, provided that at the time the action was commenced in equity, specific performance was in fact obtainable, *Harris v. Harris,* 213 Md. 592, 597, 132 A. 2d 597, 600 (1957)." (Emphasis added)

Here, specific performance was not impossible when suit was brought. Indeed, the chancellor, in refusing specific performance, pointed out "that the model home which would serve as a standard for comparative purposes during construction, has been sold and is occupied by a family who is not a party to the suit. * * * the Court knows of no compulsory process to compel that family to submit to frequent interruptions for the purpose of checking ongoing construction." Significantly, that sample house was sold by the developers more than six months *after* the bills for specific performance were filed.

The equity court had jurisdiction to grant damages in lieu of specific performance.

(c) Readiness of home buyers to perform

The chancellor found that "the evidence shows that the plaintiffs were ready and willing to perform the contracts and frequently inquired as to when their houses would be built." Our examination of the record demonstrates that there was ample evidence to support the chancellor's stated conclusion. We cannot say that he was clearly erroneous. Rule 1086.

## 2. *Rescission or Breach*

Developers contend that they were entitled to be relieved of responsibility under the contracts with home buyers by reason of the presence of a high water table below the surface of the lots. They claim that the equities are such that home buyers should not be permitted to enforce their contracts. Disclaiming any knowledge of sub-surface water conditions at the time of the execution of the contracts, developers maintain "it was not possible to construct any dwelling in accordance with the plans and specifications agreed upon and substantial redesign was required" and that "the cost of the extra work and material * * * approximates $5,000.00."

Developers rely upon *Linz v. Schuck*, 106 Md. 220, 67 A. 286 (1907); *Evergreen Amusement Corp. v. Milstead*, 206 Md. 610, 112 A. 2d 901 (1954), and *Dowling v. Bruffey*, 266 Md. 77, 291 A. 2d 471 (1972). Their reliance is misplaced. *Linz* was a case that may properly be said to have involved a contract terminated by implied mutual rescission, as is demonstrated by the following language in the Court's opinion:

"We are, however, of the opinion that this prayer can be sustained on the ground stated in *King v. Duluth, etc., Ry. Co., supra*, and other cases, which is, as expressed in that case, that 'by the voluntary and mutual promises of the parties their respective

rights and obligations under the original contract are waived, and those of the new or modified contract substituted for them.' When there is such a strong moral obligation as there was in this case to give the appellee relief, it would be making an exceedingly technical distinction to hold that the promise would have been binding if the original contract had been expressly rescinded, but that is not binding because there was no express or actual rescission, *although the facts show that it was undoubtedly intended by the parties that neither should be held to the terms of the original contract.* " (at 232 [289]) (Emphasis supplied)

In *Evergreen,* where "the owner and contractor both thought it to be a solid fact that the cuts and fills would balance" and the contract provided, *inter alia,* "no additional [fill] material will be substituted for unsuitable material [found] on the site" the Court of Appeals said at 615-16 [903], "Certainly the discovery that outside fill dirt to the value of thousands of dollars — more than the whole of the original contract cost — would be needed to reach grade, was not only *evidence of mutual mistake* but of revelation of *unforeseen* difficulty." (Emphasis added) In *Dowling,* the contract specifications had provided, *inter alia:* "Excavation: bearing soil, type — undisturbed earth." In the light of that language in the contract, the Court of Appeals said at 81 [473]: "The trial court, which tried the case without a jury, found as a fact that the parties had agreed that the contractor should perform 'extraordinary work' not covered by the contract. We cannot say that this finding was clearly erroneous."

In the subject case there was testimony tending to show (a) that the sub-surface water conditions reasonably could have been foreseen and (b) that the homes could have been constructed upon the lots at an additional cost of about $5,000.00.

The testimony of Lowell R. Glazer, President of one of the appellant corporations and the acknowledged agent for all

others associated in the general development of the Southgate subdivision, included the following:

"Q  Well, the question is isn't the reason that you have refused to build the Thomas' and the Sipples' house because of the fact that the water table extends through all of the adjacent lots which are unbuilt at the present time.

A  Yes.

Q  So that you aren't talking about the expense of making Mr. Thomas' house and Mr. Sipple's house satisfactory in the light of this condition. You're talking about the expense of clearing the condition in the entire area.

A  Yes.

Q  All right, and isn't it also true that if Mr. Thomas and Mr. Sipple's houses happen to be on the last two unbuilt lots in the subdivision, you would in fact proceed to build them, wouldn't you?

A  Yes."

There was, in sum, substantial evidence that the sub-surface water condition affecting the lots in question reasonably should have been known to the appellants and the construction could have proceeded without extraordinary cost. In such circumstances we find the language used in *Hill Co. v. Pallottine Fathers*, 220 Md. 526, 534, 154 A. 2d 821, 825 (1959), to be particularly applicable here:

"* * * we think the mistake in the instant case only went to the commercial possibilities of exploiting the tract in question, a risk which was fairly within the contemplation of the parties and within the realm of bargain."

We regard the subject case as falling within the rule succinctly stated in *Brohawn v. Transamerica Insurance Co.*, 276 Md. 396, 410, 347 A. 2d 842, 851 (1975):

"The fact that the promised performance of a

contractual obligation may be more difficult than was expected at the time the promise was made does not discharge the promissor from his duty to perform."

Appellants were not entitled to be relieved of their contractual obligations.

### 3. *The Date of Breach*

The chancellor found, with substantial record support, that breach by developers occurred in July, 1973. We cannot say that this conclusion was clearly erroneous. Rule 1086.

As will be developed in our discussion of the home buyers' appeal, this does not necessarily dispose of the issue of damages.

### *Home Buyers' Appeal*

The trial judge in his written opinion declared:

"The general rule regarding measurement of damages for breach by the vendor under a contract for the sale of real estate is the difference between the contract price and the market value of the property as of the date of breach."

He cited *Cannell v. M'Clean*, 6 H & J 297, and other cases as supporting the stated rule. He then applied that rule to the determined date of breach and adopted the opinion of the expert witness Benedict Frederick, that the dwellings, if completed at the time of breach would have a market value of $39,600.00 (Thomases); and $38,000.00 (Sipples). From that premise he deducted the contract price from the market value and added the $1,000.00 deposit that had been paid by each of the home buyers. That calculation produced the sums for which judgments were extended; *i.e.* for the Thomases for $11,350.00 and for the Sipples for $10,600.00.

On appeal, home buyers contend that the trial judge should have determined the market value as of December, 1973 (then valued by the witness Frederick at $42,000.00 as

to the Thomases, and at $40,600.00 as to the Sipples). They argue, accordingly, that judgments should have been extended in the amounts of $13,750.00 and $13,200.00, respectively.

The home buyers' contention, plausible but not persuasive, is that the circumstances are such that we should apply a damage doctrine akin to that applicable to certain actions at law brought after anticipatory breach of contract.

That doctrine is tersely, but for present purposes adequately, stated in 22 Am. Jur. 2d *Damages*, § 48 (1965) as follows:

> "Where, before the time for performance, a contract is repudiated by one party thereto, *the other party has the right and choice of awaiting the time for performance and then holding the other party responsible for all the consequences of nonperformance*, and he may then bring an action for breach of contract, if the repudiation has not been withdrawn effectively before that time." (Emphasis added)

Home buyers maintain that the filing of bills for specific performance (rather than actions at law) demonstrated that they desired *performance* of their contracts. They argue that this circumstance legally is the equivalent "of awaiting the time for performance and then holding the other party responsible for all the consequences of nonperformance."

Assuming, *arguendo*, that damages in lieu of specific performance may in some instances be calculated as of the date of performance rather than the date of breach, we are persuaded that this is not such a case. In the subject case the only date for performance stated in the contract was a date that actually preceded the breach. Home buyers, however would have us fix a performance date for the indeterminate contractual extension of the time of completion. They suggest that this date should be calculated by adding to the date of breach a period of time equal to the period of time between execution of the contract and the proposed date

initially provided for completion under it. We decline to do so.

Home buyers themselves willingly submitted to an indeterminate extension of the date for developers' performance and thus made the date of ultimate completion uncertain rather than fixed. Under such circumstances we are persuaded that the rule (adopted by the trial judge) as declared in *Cannell v. M'Clean, supra,* at 301-02, is apposite here:

> "* * * the rule, that the value at the time of the breach of contract, (whether increased or diminished,) shall be the measure of damages, can in general be productive of injury to neither party. If there should be an increase in value, the purchaser, being entitled to the thing itself, there is no injury or hardship imposed upon the vendor, (if he will withhold it in violation of his contract,) in compelling him to pay the value of it, and not permitting him to discharge himself from his engagement, by returning only the consideration paid, and pocketing the difference himself against right; and on the contrary, if there be a diminution in value, no injury is done to the purchaser, in not permitting him to recover more than such diminished value; since if the contract had been fulfilled, he would have had the property subject to that deterioration, and the restricting his recovery to the diminished value, places him only in the predicament in which he would have stood if the contract had not been broken. But if he should be suffered to resort to the amount of the consideration as the measure of damages, it would work a hardship upon the defendant, the subject of whose engagement was the land or thing only, such as it might be at the time stipulated for conveyance or delivery, without regard to what should be the then value, which did not at all enter into the contract. The safest rule there-

fore, and one which is best calculated to promote justice, is that the value at the time of the breach of contract shall be the measure of damages."

The validity of application of that principle to the subject case has not been diminished by the passage of time or the march of events.

*Judgments affirmed.*

*Appellants and cross appellees to pay three-fourths of the costs, appellees and cross appellants to pay one-fourth thereof.*