45 A.3d 844

Peter N. YAFFE, et al.

v.

SCARLETT PLACE RESIDENTIAL CONDOMINIUM, INC., et al.

No. 2775, Sept. Term, 2010.

Court of Special Appeals of Maryland.

June 5, 2012.

**430**

432

434

Andrew H. Baida (Benjamin Rosenberg, Caroline L. Hecker, Rosenberg, Martin, Greenberg, LLP, on the brief) all of Baltimore, MD.

Roger Heald, Fairfax, VA & Eric M. Rigatuso (John S. Vander Woude, Eccleston & Wolf, PC, Hanover, MD, on the brief).

\* JAMES R. EYLER, WRIGHT, RAKER, IRMA S. (Retired, specially assigned), JJ.

---

\* Eyler, James R., participated in the hearing and conference of this case while an active member of this Court; he participated in the adoption of this opinion as a retired, specially assigned member of this Court.

EYLER, JAMES R., J.

On May 5, 2009, Peter N. Yaffe, individually and as successor in interest to and assignee of Budreaux & Sammy, LLC ("Budreaux") and Columbus Piazza, LLC ("Columbus Piazza") (collectively referred to as "appellants"), filed the instant action in the Circuit Court for Baltimore City against Scarlett Place Residential Condominium, Inc. ("Scarlett Place"), Karl A. Knutsen, and Knutsen Engineering Group, LLC ("KEG") (collectively referred to as "appellees"). Appellants sought damages, specific performance, and injunctive relief stemming from alleged reoccurring water leaks and moisture infiltration in several condominiums owned by appellants located at Scarlett Place in Baltimore City. The circuit court conducted a bench trial and, at the conclusion of appellants' case, granted appellees' motions for judgment. This timely appeal followed. For the reasons set forth below, we shall affirm.[1]

## Factual and Procedural Background

Budreaux was formed in 2002 by Mr. Yaffe and his father, with Mr. Yaffe possessing a 99 percent ownership interest in the company. He acquired the remaining 1 percent interest in 2007. In 2003 and 2004, Budreaux purchased Scarlett Place Condominium units 612 and 613. According to Mr. Yaffe, he intended to combine units 612 and 613 and live in them. In 2009, Budreaux assigned all of its rights in units 612 and 613 to Mr. Yaffe. Mr. Yaffe is also the sole member of Columbus Piazza, which purchased unit 1011 in 2007.

In 2004 and 2005, there was considerable water infiltration into the Scarlett Place units, including appellants' units. In 2005, Budreaux filed suit against Scarlett Place in circuit court. In October 2006, the parties entered into a settlement agreement in which Scarlett Place agreed to pay damages and to make permanent repairs. Scarlett Place also agreed that it would deliver to Budreaux, prior to February 1, 2007, a

---

1. Judge Shirley M. Watts did not participate in the Court's decision to designate this opinion for publication in the Maryland Appellate Reports pursuant to Maryland Rule 8–605.1.

certification from a registered professional engineer that the water leak and moisture penetration repairs had been completed or, if not, pay $6,000 per month until delivered.

Scarlett Place had been experiencing water infiltration problems with respect to many units for many years. As a result, on January 18, 2006, Scarlett Place entered into a contract with KEG pursuant to which KEG agreed to make repairs to the terrace decks and walls of the entire building ("the AIA contract"). Shortly after the October 2006 settlement agreement, KEG agreed to investigate leaks, including in units 612 and 613, and to create a design to prevent water infiltrations in those units.

With respect to the October 2006 settlement, Scarlett Place did not deliver a timely certification. Scarlett Place delivered a certification dated March 30, 2007, but Mr. Yaffe did not accept it. According to Mr. Yaffe, leaks continued.

In April 2007, Budreaux filed a second suit in circuit court against Scarlett Place. On June 29, 2007, the parties entered into a second settlement agreement. Scarlett Place paid Budreaux money, agreed to install terrace doors, and delivered a certification dated June 28, 2007, as described in the October 2006 settlement agreement.

In the fall of 2007, Columbus Piazza purchased unit 1011. In late 2007 and thereafter, Mr. Yaffe complained about leaks in all three units.

In February 2008, Budreaux and Columbus Piazza filed a third suit in circuit court against Scarlett Place. Throughout this period of time, appellants were performing some renovation work on their units but also took the position that they could not move forward until after the leaks were stopped.

On July 21, 2008, the parties entered into a third settlement agreement. Scarlett Place agreed to pay money and conduct more repairs. Scarlett Place also delivered a certification dated July 21, 2008, as described in the October 2006 settlement agreement.

More leaks and repair work followed. By January 2009, Scarlett Place took the position that repairs had been completed. In May 2009, appellants filed this suit against Scarlett Place and the Knutsen entities.

The fifth amended complaint is the operative complaint. Most counts of the complaint are relevant to this appeal. In count 1, appellants requested the court to grant specific performance of the July 2008 settlement agreement by Scarlett Place.

In count 6, Mr. Yaffe alleged that he was a third party beneficiary of the repair agreement between Scarlett Place and KEG entered into after the first settlement agreement in October 2006, and that KEG breached that contract. Appellants sought compensatory damages.

In count 9, appellants sought a permanent injunction against Scarlett Place, requiring it, *inter alia,* to repair all leakage and other water problems.

In the remaining relevant counts of the complaint, appellants collectively and separately alleged a variety of claims against Scarlett Place and the Knutsen entities, such as negligence, breach of contract, negligent misrepresentation, and trespass. Appellants sought compensatory damages.

Eventually, the parties went to trial. Following the conclusion of appellants' case, appellees filed motions for judgment. After hearing argument on the motion, the circuit court granted the motions in an oral opinion.

With respect to count 1, the court found that specific performance was not warranted because appellants had not established the absence of an adequate remedy at law.

With respect to count 6, the court found that the appellees did not intend for appellants to be third party beneficiaries of the AIA contract and any subsequent contract for repairs specific to units 612 and 613.

With respect to count 9, the court found that the elements for injunctive relief had not been satisfied.

As to the seven remaining relevant counts, the court found that appellants did not adequately prove damages. The court found that appellants did not prove damages based on diminution in value of units 612 and 613 because the evidence did not support the valuation of the Plaintiff's real estate expert, Jennifer Stick. Thus, the court did not find the expert's testimony credible. The court noted that all parties agreed that the property damage was repairable. The court found appellants had not proved the cost of restoring the property to a non-damaged condition. The court concluded that the measure of damages based on the claim for loss of use was the reasonable rental value of comparable property, and appellants failed to present such evidence. In addition, the court found that appellants had not shown a loss of use for units 612 and 613 because appellants were not precluded from using the units due to water infiltration. The court also found that appellants had failed to prove breach of the 2007 settlement agreement; failed to prove any reliance on or misrepresentation by KEG related to the June 29, 2007 settlement agreement; and found that appellants had released appellees from any claims predating the June 29, 2007 settlement agreement.[2] Thus, the court granted appellees' motion for judgment.

We shall include additional facts when we discuss the issues.

## Questions Presented

As phrased by appellants, the following questions are presented for our review:

1. Was Mr. Yaffe a third-party beneficiary of Mr. Knutsen's agreement with Scarlett Place to repair the water leaks and moisture penetration problems in Mr. Yaffe's condominium units which Mr. Knutsen certified several times had been corrected?

2. Are Plaintiffs entitled to damages measured by the mortgage interest, real property taxes, insurance, and other carrying costs of their property which they have been

---

2. The court made other findings not relevant to the issues raised on appeal.

unable to use as a result of Defendants' failure to correct the water leaks, moisture penetration, and mold affecting their condominium units?

3. Did the Circuit Court err as a matter of law in holding that Plaintiffs cannot obtain specific performance relief because they have also sought damages?

4. Did the Circuit Court abuse its discretion in entering judgment on Plaintiffs' claim seeking injunctive relief requiring Scarlett Place to correct the moisture penetration and mold contamination in their condominium units caused by water leaking from the limited common elements over which Scarlett Place has exclusive control?

## Standards of Review

Maryland Rule 2–519(b) provides that, "[w]hen a defendant moves for judgment at the close of the evidence offered by the plaintiff in an action tried by the court, the court may proceed, as the trier of fact, to determine the facts and to render judgment against the plaintiff or may decline to render judgment until the close of all the evidence." In such a case, we review the circuit court's grant of a motion for judgment in accordance with Maryland Rule 8–131(c):

> When an action has been tried without a jury, the appellate court will review the case on both the law and the evidence. It will not set aside the judgment of the trial court on the evidence unless clearly erroneous, and will give due regard to the opportunity of the trial court to judge the credibility of the witnesses.

■ "The clearly erroneous standard does not apply to the circuit court's legal conclusions, however, to which we accord no deference and which we review to determine whether they are legally correct." *Cattail Assocs., Inc. v. Sass*, 170 Md. App. 474, 486, 907 A.2d 828 (2006) (citation omitted).

In several areas in their brief, appellants argue that if there was any supporting evidence presented in the record, the trial court should not have granted the motion for judgment at the end of the plaintiff's case on the grounds that there was "no

evidence" supporting the claim. Maryland Rule 2–519(b) clearly indicates that when the court is a fact finder it may assess the credibility of witnesses and the weight of the evidence and make a determination. In context, it is clear that is what the court did, and its use of the expression "no evidence" meant no persuasive evidence.

■ We review the circuit court's denial of equitable relief, such as a permanent injunction or specific performance of a contract, for an abuse of discretion. *Kemp v. Kemp*, 287 Md. 165, 176, 411 A.2d 1028 (1980); *State Comm'n on Human Rels. v. Talbot County Det. Ctr.*, 370 Md. 115, 127, 803 A.2d 527 (2002).

■ Additionally, for the purposes of this case, it is important to note that although an appellate court will not ordinarily consider an issue that was not previously raised in the trial court, an appellate court can affirm when "the record in a case adequately demonstrates that the decision of the trial court was correct, although on a ground not relied upon by the trial court and perhaps not even raised by the parties." *Robeson v. State*, 285 Md. 498, 502, 403 A.2d 1221 (1979) (citations omitted). In other words, we can affirm when the trial court's decision was right for the wrong reasons. "Considerations of judicial economy justify the policy of upholding a trial court decision which was correct although on a different ground than relied upon." *Id.*

## Discussion

The evidence supported the following determination by the circuit court. Mr. Yaffe was not a third party beneficiary of any contract between Scarlett Place and the Knutsen entities. Although loss of use damages of residential property can consist of items other than or in addition to the reasonable rental value of comparable property, here, there was no evidence of market value and no evidence of other types of costs caused by the alleged wrongdoing. Finally, the court did not abuse its discretion in denying the equitable remedies

of specific performance or a permanent injunction. We shall discuss each of these issues in turn.

### 1. Third Party Beneficiary

First, appellants contend that the court erred in finding that the Knutsen entities and Scarlett Place did not intend to provide third party beneficiary status to Mr. Yaffe in their agreement to correct water infiltration issues in units 612 and 613. Appellants argue that Mr. Yaffe was an intended beneficiary of KEG's design and repair agreement with Scarlett Place that was entered into "after the October 2006 Settlement Agreement was reached." [3] Appellants argue that the original AIA contract between the Knutsen entities and Scarlett Place is irrelevant in determining the intent of the parties because the services rendered for units 612 and 613 were in addition to and separate from the work Mr. Knutsen performed for the entire building.

The Knutsen entities respond by stating that the AIA contract expressly precluded third party beneficiary status and also stated that any additional work or agreements between the parties "shall not modify the rights, responsibilities or obligations" of KEG as described in that agreement. The Knutsen entities also point out that at trial, Mr. Knutsen testified that all services performed by KEG at Scarlett Place were performed under the AIA contract, including the work

---

**3.** Relying on express provisions in the AIA contract, appellees argue that the AIA contract controlled all repair work done by KEG, and it did not confer third party beneficiary status. Appellants do not rely on the AIA contract and argue that the controlling contract is one subsequent to the AIA contract. In order to recover damages, however, appellants would have to be able to point to a contract under which they have third party beneficiary status. In the June 29, 2007 settlement agreement, appellants released Scarlett Place and various other entities, including its agents, contractors, and all entities "which may have any liability, or be alleged to have any liability for, by or through" Scarlett Place, from all clams through the date of the agreement. Due to the release of liability found by the trial court, the underlying contract would have to be a repair agreement between Scarlett Place and KEG that was created after the second settlement agreement on June 29, 2007.

for units 612 and 613. He also testified that the parties had no intent to benefit Mr. Yaffe through their agreement.

In *Mackubin v. Curtiss–Wright Corp.*, the Court of Appeals explained that a third party beneficiary cannot enforce a contract merely because "the contract may operate to his benefit." 190 Md. 52, 58, 57 A.2d 318 (1948). In that case, the third party is referred to as an "incidental" beneficiary. Instead, "[i]t must clearly appear that the parties intend to recognize him as the primary party in interest and as privy to the promise." *Id.* The primary method of determining the intention of the parties to a contract is to look at the language in the contract. *Volcjak v. Washington County Hosp. Ass'n,* 124 Md.App. 481, 509, 723 A.2d 463 (1999). When determining third party beneficiary status, "the controlling issue is whether the contract's terms, in light of the surrounding circumstances, reveal an intent to make the promise to the third party in fact if not in form." *College of Notre Dame of Maryland, Inc. v. Morabito Consultants, Inc.,* 132 Md.App. 158, 179, 752 A.2d 265 (2000).

In granting appellees' motion for judgment below, the circuit court stated that:

> Accordingly, under the law, there must be an intent to create third party beneficiary status. It is not enough that a contract may operate to the benefit of a third party. It must be clear that the contracting parties intended to recognize Mr. Yaffe as a primary party in interest and a privy to their promise. In this case, the AIA contract specifically rejects that possibility by its terms. To the extent that the Plaintiff may contend that the AIA contract alone does not govern and that there were other repair contracts or agreements over time between Scarlett Place and Knutsen, there has been no showing that Mr. Yaffe was intended to be a third party beneficiary of any agreement between Scarlett Place and Knutsen.

> Mr. Knutsen took on additional responsibilities during his relationship with Scarlett Place and acknowledged those. His testimony and the Court repeats, that he was working

for Scarlett Place and began completely unaware even of the settlement agreement between Scarlett Place and Yaffe. There has simply been no evidence presented that either Mr. Knutsen or Scarlett Place intended and had a meeting of the minds that Mr. Yaffe would be a third party beneficiary in interest to any contractual relationship between the parties.

■ There is ample evidence to sustain the circuit court's finding that Mr. Yaffe was not an intended third party beneficiary of any agreement between the Knutsen entities and Scarlett Place to correct the water infiltration issues in units 612 and 613. The court found that there were no implied in fact contracts between appellants and KEG. Thus, the original AIA contract controls. First, Section 9.7 of the AIA contract explicitly states that the parties did not intend to confer any rights to any third parties: "[n]othing contained in this Agreement shall create a contractual relationship with or a cause of action in favor of a third party against either the Owner or Architect." Second, in Article 3, the AIA contract also outlines the possibility of "Additional Services" between the parties. Specifically, Section 3.2.1 states that "[i]f more extensive representation at the site than is described in Section 2.6.5 is required, the Architect shall provide one or more Project Representatives to assist in carrying out such additional on-site responsibilities." Section 3.23 further provides that "[t]hrough the presence at the site of such Project Representatives, the Architect shall endeavor to provide further protection for the Owner against defects and deficiencies in the Work, but the furnishing of such project representation shall not modify the rights, responsibilities or obligations of the Architect as described elsewhere in this Agreement." This language strongly indicates that the parties did not intend to confer standing upon any third-party, whether for the services rendered under the AIA contract or for "additional services" rendered under Article 3 and subsequent agreements.

Additionally, appellants failed to present sufficient evidence that, assuming a subsequent unwritten repair contract, the

parties intended to create a third party beneficiary under that document. Mr. Knutsen specifically testified that he never entered into any agreements with Scarlett Place with the intention of benefitting any third party, including Mr. Yaffe or Budreaux. Mr. Knutsen testified that any additional services rendered by him to Scarlett Place were covered under Article 3 of the AIA contract. He also noted that when he agreed to undertake the additional work relating to units 612 and 613, he communicated to Scarlett Place that he was proceeding with that work as additional services under the AIA contract. He claimed that he never entered into any other separate written agreement for the work performed on units 612 and 613. In light of this significant evidence, the trial court did not err in finding that Mr. Yaffe was not a third party beneficiary of any agreement between the Knutsen entities and Scarlett Place.

### 2. Loss of Use Damages

Appellants also contend that the court erred in granting appellees' motion for judgment because appellants "failed to demonstrate damages sufficient to warrant recovery under any of the theories or causes of actions." Specifically, Appellants argue that they should have been able to claim carrying costs, such as mortgage interest, real property taxes, condominium fees, and special assessments, as damages resulting from appellees' conduct. In granting appellees' motion for judgment, the circuit court held that loss of use damages are limited to the "reasonable rental value of comparable property," citing Subsection D of Maryland Civil Pattern Jury Instruction 10:21. The court reasoned that a Plaintiff's actual expenses, such as carrying costs, without further proof, are not an adequate measure of loss of use damages. Additionally, the court made a factual finding that, as to units 612 and 613, Mr. Yaffe was not "precluded from using or residing at the units due to water infiltration" and, therefore, was not entitled to any loss of use damages for those units.

Appellants claim that carrying costs are recoverable compensatory damages under Maryland law as either "diminution in value" or "loss of use" damages, relying primarily on *Reichs*

*Ford Rd. Joint Venture v. State Rds. Comm'n*, 388 Md. 500, 880 A.2d 307 (2005), and *7–Eleven, Inc. v. Dep't of Envtl. Quality*, 42 Va.App. 65, 590 S.E.2d 84 (2003). Appellants note that "loss of use" damages are not necessarily limited to the property's rental value but can include carrying charges when one is unable to use the property for which the fees are charged. Appellants also note that there was sufficient evidence of water infiltration for units 612 and 613 for their claims to survive a motion for judgment.

Appellees respond that appellants are unable to now claim that the carrying costs should be considered "diminution in value" damages because throughout the trial these costs were only presented as "loss of use damages" and because appellants "sought distinct and different damages for diminution in value from Scarlett Place at trial." Appellees contend that comparable rental value is the proper measure of loss of use damages and that *Reichs Ford* and *7–Eleven, Inc.* are distinguishable from this case. Appellees also note that it was within the circuit court's power to make a factual finding regarding the actual loss of use in units 612 and 613, and the circuit court did not err.

In a tort action for damages based on repairable property,[4] damages are measured by (1) the diminution in value of the land or the cost of repair and (2) the value of the lost use of the property. *Superior Construction Co. v. Elmo*, 204 Md. 1, 9 (1954) (quoting Restatement (First) of Torts § 929 (1939)).[5]

---

**4.** Here, both parties appear to agree, and the circuit court acknowledged, that the damages are repairable.

**5.** For breach of contract claims, a plaintiff may recover the amount of damages "which will place the injured party in the monetary position he would have occupied if the contract had been properly performed." *Hall v. Lovell Regency Homes Ltd. Pship.*, 121 Md.App. 1, 12, 708 A.2d 344 (1998). In breach of contract actions involving defective performance of a construction contract, damages are measured by the reasonable cost of repair as long as it does not involve unreasonable economic waste. If economic waste results, the proper measure of damages is the diminution of market value. *Andrulis v. Levin Constr. Corp.*, 331

In their brief, appellants first argue that the carrying costs are recoverable as compensatory damages under a "diminution in value" analysis. Appellants introduced the carrying costs at trial as loss of use damages, however, and appellees challenged those carrying costs on that basis. Further, appellants pursued diminution in value damages on the basis of the difference in market value of units 612 and 613, as valued by a forensic appraiser, at different periods of time. Finally, the circuit court never addressed the concept of carrying costs as diminution in value damages; it only ruled on the basis of carrying charges as loss of use damages. Ordinarily, we will not decide an issue "unless it plainly appears by the record to have been raised in or decided by the trial court." Md. Rule 8–131. We shall consider the claimed damages in the context of loss of use.

Even if we considered the claimed damages in the context of diminution in value, however, appellants would be unable to recover carrying charges as compensatory damages. Appellants primarily rely on the Court of Appeals' holding in *Reichs Ford*. In that case, the Court discussed compensation for property owners affected by the State's eminent domain power. The Court held that, although the fair market value of the property is typically the only compensation available in an eminent domain condemnation proceeding, the legislature also intended, under the statutory scheme of Maryland Code (2010 Repl.Vol.) § 12–105 of the Real Property Article, for the landowner to be able to recover damages such as "real property taxes, mortgage interest, insurance, and other costs associated with maintaining the property" from the time the governmental body decides to take the specific property until the date of the actual taking. *Id.* at 521–22, 880 A.2d 307.

The Court based its decision on legislative history, particularly the legislature's concern that announcing the eminent domain condemnation to the public prior to the actual taking results in "vacating tenants and the inability to put the

Md. 354, 371–72, 628 A.2d 197 (1993) (Citing Corbin on Contracts, § 1089, at 485–87 (1964)).

property to any other viable use, and other costs of maintaining a property while waiting for the governmental formally to exercise eminent domain or renounce its interest." *Id.* at 519, 880 A.2d 307. The Court also rationalized that its decision would create "an incentive for the State expeditiously to resolve or prosecute condemnation proceedings rather than, as in this case, possibly dragging its feet." *Id.* at 523, 880 A.2d 307.

*Reichs Ford* has very little application to this case. *Reichs Ford* was concerned with compensation in the eminent domain area, which is regulated by statute, and looked to legislative history and policy concerns unique to an eminent domain issue to rationalize its decision. Here, we are concerned with a question of the proper measure of common law tort damages for injury to repairable property. There is no statute and, thus, no legislative intent governing this issue. Additionally, it is highly doubtful that diminution in value damages are available without proof of permanent damage, absent a showing that repair is impractical or the cost of repair is disproportionate to the diminution in value of the land. In any event, without more, we are unable to conclude that the court erred in not taking carrying costs into consideration as part of a diminution in value claim.

Appellants also argue that carrying costs should have been considered as loss of use damages. In discussing loss of use damages, Restatement (Second) of Torts § 929 cmt. d (1977) provides:

> In addition to damages for the diminution of the value or other similar elements of damage, the plaintiff is entitled to recover for the past or prospective loss of use caused by the defendant's wrong as far as this has not been included in the other elements of damages awarded to the plaintiff, as stated in § 931. Thus if the plaintiff's land has been flooded for a month so that he was unable to use the land, he is entitled to recover for this loss although there was no permanent harm to the land caused by the flood.

■ Thus, a plaintiff is entitled to the value of the loss of use of the land for the period in which the plaintiff was unable to use it, even after use of that land had been restored to him and even when the plaintiff had not suffered any lasting harm. *Superior Constr. Co. v. Elmo,* 204 Md. 1, 12 (1954).

■ Appellees, citing Maryland Civil Pattern Jury Instruction 10:21, argue that "loss of use" damages cannot include carrying costs and can only be measured by the "reasonable rental value of comparable property." While pattern jury instructions are not primary authority, this interpretation is supported by *Superior Const. Co.,* where the Court of Appeals held that when a landowner is temporarily deprived of occupancy of property, the landowner can recover the rental value for that period under the doctrine of loss of use damages, but only so far as it has not already been included in other categories of damages awarded to the plaintiff. 204 Md. at 9. However, there are several cases which discuss the measure of loss of use damages outside of the realm of "the reasonable rental value of comparable property."

First, in *Mayor and City Council of Havre de Grace v. Maxa,* construction of a retaining wall by the Havre de Grace city council resulted in a deposit of nearly 7000 cubic yards in front of the landowners' property, cutting off the landowners' access to the Chesapeake Bay. 177 Md. 168, 174–75, 9 A.2d 235 (1939). Although *Maxa* dealt with permanent damage to property, its discussion of what to award for the loss of use of the property is nevertheless instructive. The plaintiff landowners' prayer for damages asked for

the difference between the fair market value of the property in question before the injuries complained of and after their commission, *'together with such loss as the jury may believe the plaintiffs sustained, if any, in the usable value of the property,'* less such damages as the plaintiffs might have prevented by reasonable expense and trouble and except all damage which may have been caused to said property in common with that sustained by the general public.

*Id.* at 182, 9 A.2d 235 (emphasis added). The Court of Appeals noted that "usable value" in this context is not rental value because "the plaintiffs occupied the premises affected, and so were not deprived of the use or rent." *Id.* Instead, the Court found that "usable value" "referred to the personal enjoyment and use by the plaintiffs as occupiers of the premises, independently of the difference in market value." *Id.* Therefore, the plaintiffs were allowed to recover for boat storage and wharfage charges, as plaintiffs were no longer able to house a boat on the property as a direct result of the defendant's actions. *Id.* at 182–83, 9 A.2d 235.

Next, in *Gorman v. Sabo*, the plaintiff filed a nuisance action against a neighboring landowner for the "wilful, malicious, long-continued" beaming of loud noise directed towards the plaintiff's home. 210 Md. 155, 158, 122 A.2d 475 (1956). In that case, the Court of Appeals provided that:

> [w]here there is a non-trespassory invasion of rights in real property occupied by the owner as a home, consisting of a temporary private nuisance, the measure of damages is the diminution in the value of the use of the property as a home. The elements to be considered in the loss of the value of the use include the ordinary use and enjoyment of the home, and may also include sickness or ill health of those in the home caused by the nuisance. Sutherland on Damages, 4th Ed., Vol. 4, Sec. 1048, p. 3890, says that the law is: "A plaintiff who occupies a home is not limited to the recovery of the diminished rental value of it, but may be compensated for any actual inconvenience and physical discomfort which materially affected the comfortable and healthful enjoyment and occupancy of his home."

*Id.* at 162, 122 A.2d 475.

Finally, in *Hall v. Lovell Regency Homes Ltd. Pship*, the homeowner plaintiffs sued the builder of their homes after drainage problems damaged the homes and made it impossible for them to use the homes as planned. 121 Md.App. 1, 5–7, 708 A.2d 344 (1998). Similar to *Maxa* this case dealt with permanent damage to property, but its discussion of what to

award for the loss of use of the property is nevertheless instructive. The trial court ruled that plaintiffs were not entitled to damages for "loss of use and enjoyment" of their houses in addition to damages for injury to their property value, and we affirmed. In coming to our decision, we noted that the "injuries for which the homeowners sought damages were not injuries to property, rather they were pecuniary, i.e., injuries to their financial interests in their real estate transactions with [the defendant]." *Id.* at 25–26, 708 A.2d 344. We went on to explain that

> [t]he damages that the homeowners were seeking for loss of use of their basements (and their yards) were subsumed in and were not distinguishable from the damages that they were seeking for loss in fair market value of their properties. The conditions that the homeowners contended made their properties defective, and irreparably so, were the water and drainage problems that they asserted made their basements and yards unusable. The only non-speculative value that could be assigned to the homeowners' loss of use of those portions of their properties would be the difference between the value of each property with a usable basement and yard and its value without a usable basement and yard, at a single point in time, *i.e.*, loss in fair market value.

*Id.* at 25, 708 A.2d 344. We concluded that because the plaintiffs did not lose any rental value, "nor did they introduce evidence of any expenditures akin to the consequential damages incurred by the landowner plaintiff in *Maxa*," and their remaining claims were for unrecoverable mental distress damages, the trial court did not err. *Id.* at 26, 708 A.2d 344.

As the above cases demonstrate, the determination of damages for "loss of use," for both temporary and permanent damage to property, must be flexible and based on the factual circumstances of each case. As the cases demonstrate, it is important to distinguish between a mental distress personal injury claim allegedly related to property damage; diminution in value of property; economic loss of use of property; and noneconomic loss of use of property. Non-economic loss of use occurs when the owner's personal use is restricted, e.g.,

excessive noise, dust, or more germane here an inability to fully use a portion of the property. In the case before us, there are no claims of mental distress and no claims of non-economic loss of use of property. While economic loss of use is not necessarily always measured by reasonable rental value of comparable property, and consequential damages may be recoverable, the concepts of diminution in value and economic loss of use, at least under Maryland law, are based on some measure of market value.

■■■ With respect to economic loss of use damages, the main inquiry should be 1) whether the damages directly stem from the plaintiff's inability to utilize the land as a result of the defendant's conduct, 2) whether the requested loss of use damages are separate from other damages such as diminution in *value* or the costs of repair, and 3) whether the evidence proves the value of the loss of use. Here, there was no evidence of market value in order to assess whether carrying charges represented the value of economic loss of use, or whether they were separate from diminution in value, if any.

Appellants primarily rely on a Virginia case, *7–Eleven, Inc. v. Dep't of Envtl. Quality,* for the proposition that they may be compensated for carrying costs "in addition to and distinct from its claim of diminution in land value." 42 Va.App. 65, 85, 590 S.E.2d 84 (2003). That case revolved around issues of reimbursement from a statutorily created environmental petroleum fund, after contamination of property due to a petroleum spill.

The court held that, in an appropriate case, damages for loss of use may be awarded in addition to damages for diminution of value. *Id.* at 82–84, 590 S.E.2d 84. Those damages may include any "additional" carrying costs that were "proximately caused" by the spill. *Id.* at 84, 590 S.E.2d 84 (emphasis added). In *7–Eleven, Inc.,* there were claims for loss of rental value and expenses that would not have been incurred absent the contamination. There was expert testimony addressing those claims. The case is authority for the proposition that loss damages may not always be limited to

rental value but is not authority for the proposition that carrying costs, without more, are a proper measure of loss of use.

In this case, the carrying charges, standing alone, do not prove the value of the appellants' loss of use in the property. The charges would have been incurred absent any wrongful conduct by appellees. Thus, any loss of use has to be tied to the market value of that loss, and there was insufficient evidence to do so here.

Finally, with regard to units 612 and 613 only, appellants appeal the circuit court's factual finding that appellants did not experience a loss of use. The circuit court stated:

Additionally in this case, as to units 612 and 613, the court simply finds not [sic] evidentiary support for the conclusion that the Plaintiff was precluded from using or residing at the units due to water infiltration. As stated earlier-strike that. The Plaintiff in testimony acknowledged that the area effected [sic] by water infiltration at 612, 613, was a 16 by 20 square foot area near the balcony doors of a 3,400 foot square Condominium unit.

The court does not find as a factual matter, even if the court were inclined to accept Plaintiff's argument that damages in a repairable damage case can somehow be the cost of carrying the property or cost of paying the expenses, that this Plaintiff was precluded by any actions from the Defendant in residing at 612 and 613 based on the allegations or testimony in this case.

Appellants claim that the court's decision "cannot be reconciled with the undisputed expert testimony discussed previously that none of the three properties in this case should be renovated until the water leaks and moisture penetration issues which have plagued units 612, 613, and 1011 for years are corrected."

Here, as the trier of fact, the circuit court was free to disregard expert testimony and weigh the evidence in coming to a conclusion. The trial court heard testimony from 17 witnesses over the course of 16 days. The court made a site

visit to units 612 and 613. The court reviewed extensive photographic evidence relating to units 612 and 613. The circuit court did not abuse its discretion in determining, as a matter of fact, that appellants had not lost the use of units 612 and 613.

■ In conclusion, although, in an appropriate case, "loss of use" damages can be measured other than by the reasonable rental value of a comparable property, appellants were not entitled to recover carrying costs as either diminution in value damages or loss of use damages. In addition, the circuit court did not err in determining that appellants had not actually lost the use of units 612 and 613.

### 3. Specific Performance

■ Next, appellants allege that the circuit court abused its discretion in denying appellants' request for specific performance of the third settlement agreement, dated July 21, 2008. In denying specific performance, the court stated:

The Court in its exercise of discretion declines to grant specific performance in this case and indeed grants the Defendant Scarlett Place's Motion for Judgment finding that the Plaintiff has not demonstrated that there is no adequate remedy at law. Indeed in this case the Plaintiff, via the fifth amended complaint, brings 12 separate counts seeking damages for negligence, breach of contract, fraud, breach of implied contract, implied third party beneficiary claims, negligent misrepresentation, negligence for new leaks, breach of contract for new leaks, and trespass.

The Plaintiff clearly has not demonstrated that there is no adequate remedy at law here. The Court accordingly grants the Defendant Scarlett Place Residential, Inc.'s Motion for Summary Judgment—strike that, Motion for Judgment, at the conclusion of the Plaintiff's case as to Count I on specific performance. Taking the evidence in the light most favorable to the Plaintiff in exercising the Court's discretion, there simply is not a basis to grant specific performance in this case.

Appellants argue that the circuit court abused its discretion because it based its decision on the fact that plaintiffs had an adequate remedy at law. Under Maryland Code (2006 Repl. Vol.) § 3–601 of the Courts and Judicial Proceedings Article, a court may not refuse to specifically enforce a contract on the ground that the party seeking specific enforcement has an adequate remedy in damages unless the party resisting specific enforcement shall (1) [p]rove that the party has property from which the damages may be collected; or (2) [g]ive bond in an amount to be determined by the court and with security approved by the court, to perform the contract or pay all costs and damages that may be adjudged for breach or nonperformance against the party resisting specific enforcement.

The two exceptions to this rule do not apply here.

■■ Nevertheless, the court did not abuse its discretion because there is simply no reason given in the record to require the equitable remedy of specific performance. Specific performance is an "extraordinary equitable remedy which may be granted, in the discretion of the chancellor, where more traditional remedies, such as damages, are either unavailable or inadequate." *Archway Motors, Inc. v. Herman,* 37 Md.App. 674, 681, 378 A.2d 720 (1977).

■■ Further, there is a general rule, that contracts for the construction or repair of buildings should not be specifically enforced "on account of the great difficulty and often impossibility attending a judicial superintendence and execution of the performance." *Fran Realty, Inc. v. Thomas,* 30 Md.App. 362, 366, 354 A.2d 196 (1976) (quoting Pomeroy's Specific Performance of Contracts § 23 at 61 (3d Ed.1926)). There are two exceptions to this rule: 1) when an agreement for constructing a building is already strictly defined; and 2) when the construction is to be done on land controlled by the defendant but the plaintiff has a material interest in that construction. *Id.*

Appellants argue that the second exception applies in this case because Scarlett Place has "exclusive authority under Article Five of its Condominium Regime Declaration to repair

the leaking balconies and terraces because they are common elements over which [appellants] have no control." Therefore, appellants argue that specific performance is necessary because they "do not have the legal right to make the necessary repairs on their own."

The Scarlett Place Residential Condominium Regime Declaration defines the "common elements" as "all of the Condominium, except the units." Each unit owner is responsible for the "ordinary maintenance, replacement . . . or repair" of "limited common elements," such as the "unit entrance, balcony doors and frames, window frames and glass, and balconies and terraces" while the Condominium is responsible for expenses arising out of "structural maintenance, repair or replacement" of the limited common elements. Scarlett Place is also responsible for "any expense of maintenance, repair or replacement relating to the "general common elements," which are defined as "all the common elements not described above as a part of the limited common elements."

The third settlement agreement identified a number of repairs which Scarlett Place agreed to perform in units 612, 613 and 1011. Some of the repairs are not related to any "common elements," limited or general, as above defined, such as repainting in units 612 and 613, repairing sprinkler heads in 1011, repairing or replacing the ceiling in the kitchen and hallway in 1011, treating the ceiling and interior walls in 1011, and repairing drywall in 1011.[6] Other repairs are seemingly related to the ordinary maintenance and repair of "limited common elements," such as repairing globe lights on the balcony of units 612 and 613, repositioning the downspout on the 1011 balcony, or resealing the master bedroom window in 1011. Appellants have failed to demonstrate that any of these

---

6. The Condominium Declaration provides an extensive definition of the term "unit," which appears to include non-load bearing walls, electrical installations, and plumbing fixtures. Without more evidence, it is unclear whether the ceiling, interior walls, and drywall would fall under this definition of "unit," but these items do not immediately fall under the definition of common elements as defined in Article Five of the Condominium Declaration.

specific repairs fall under the concept of "common elements" for which Scarlett Place is responsible for expenses resulting from maintenance, repair, or replacement.

Another section of the settlement agreement pertains to "temporary protection measures" which Scarlett Place agreed to undertake by repairing leaks throughout unit 1011. Appellants made no showing below on whether those repairs would be considered "structural" repairs and whether they apply to parts of the unit or common elements.

In addition, the Condominium Regime Declaration merely states that Scarlett Place is responsible for "expenses" arising out of the "structural maintenance, repair, or replacement" of the limited and general common elements, not that Scarlett Place is the only entity that can make repairs. The language of the Condominium by-laws also does not appear to restrict the owner from making repairs to the common elements and seeking reimbursement. Appellants are unable to establish that the third settlement agreement does not fall under the general principle that courts should not specifically enforce a contract for repairs.

We are free to affirm a trial court's decision when it is correct for a reason other than that relied upon. We perceive no reversible error.

### 4. Permanent Injunction

Finally, appellants allege that the circuit court abused its discretion in denying permanent mandatory injunctive relief requiring Scarlett Place to correct and repair all water leaks, moisture penetration, and mold contamination in units 612, 613, and 1011. On the permanent injunction claim, the circuit court stated the following:

> In Count IX, the Plaintiff alleges a claim or requests a permanent injunction. The Plaintiff alleges that a permanent injunction should be entered requiring Scarlett Place to correct all water leaks, moisture, infiltration, and mold contamination in units 612, 613, and 1011. There are four elements required for the grant of a permanent injunction.

The four elements are, 1); the likelihood that the Plaintiff will succeed on the merits, 2); the balance of convenience determined by whether greater injury would be done to the Defendant by granting the injunction than would result from its refusal, 3); whether the Plaintiff will suffer irreparable injury unless the injunction is granted, and 4); the public interest.

*State Commission on Human Relations versus Talbot County Detention Center*, 370 Md., page 115 [803 A.2d 527], 2002, decision of the Maryland Court of Appeals. Taking the evidence in the light most favorable to the Plaintiff, the non-moving party, the Court concludes that the Plaintiff has not established any of the four elements necessary for the granting of a permanent injunction in this matter.

Indeed an argument on the Motion for Judgment, none of the four elements was specifically addressed. And while the Plaintiff may feel that there is an equitable obligation or a duty owed by the Defendant to correct what it alleges to be the leaks, the Plaintiff simply has not shown or argued that the Plaintiff will succeed on the merits, the balance of the convenience, the irreparable injury, or the public interest elements necessary to grant the injunction at Count IX.

 Appellants first point out that the circuit court abused its discretion because the four factors cited by the court are factors required for a party to obtain an interlocutory or preliminary injunction, not a permanent injunction. In fact, as appellees point out, the proper question is whether the petitioner for permanent injunctive relief must allege and prove facts "that it will sustain substantial and irreparable injury as a result of the alleged wrongful conduct." *El Bey v. Moorish Sci. Temple of Am., Inc.*, 362 Md. 339, 355, 765 A.2d 132 (2001) (citations omitted). Injury is irreparable when it is of such a character that a fair and reasonable redress may not be had in a court of law, so that to refuse the injunction would be a denial of justice—in other words, where, from the nature of the act, or from the circumstances surrounding the person injured, or from the financial condi-

tion of the person committing it, it cannot be readily adequately, and completely compensated for with money.

*Id.* at 356, 765 A.2d 132. While it appears the circuit court applied the preliminary injunction standard, one factor in that standard is "whether the Plaintiff will suffer irreparable injury unless the injunction is granted."

Appellants argue that unless Scarlett Place completes the repairs, appellants will be unable to renovate units 612, 613, and 1011. This is not an injury of a character where a "fair and reasonable redress may not be had in a court of law." In fact, if appellants had been able to adequately prove damages to survive a motion for judgment, they may have been able to recover in a court of law on a myriad of different legal claims. For units 612 and 613, the court made a factual finding that Mr. Yaffe could in fact reside in or rent these units. Finally, as discussed *supra,* it appears as if appellants would not be limited by the condominium declaration and could conduct most if not all of the repairs contemplated in the third settlement agreement. Therefore, the circuit court did not abuse its discretion in denying appellants' request for a permanent injunction.

Because we are affirming the circuit court's decision to grant appellees' motion for judgment for the above reasons, there is no need to address Mr. Knutsen and KEG's alternative arguments that 1) appellant's claims against Mr. Knutsen and KEG cannot succeed because the March 2009 assignment upon which those claims were based did not assign any claims against Mr. Knutsen or KEG or that 2) the July 2008 settlement agreement released all of appellants' claims against Mr. Knutsen and KEG. The circuit court did not err, and we shall affirm.

**JUDGMENT AFFIRMED. COSTS TO BE PAID BY APPELLANT.**